## COLUMBIAN NAT. LIFE INS. CO. v. BLACK.

Circuit Court of Appeals, Tenth Circuit.
October 16, 1929.

No. 3.

572

Clarence A. Brandenburg, of Denver, Colo. (Stanley C. Brandenburg, of Denver, Colo., on the brief), for appellant.

Alva B. Adams, of Pueblo, Colo. (Robert S. Gast, of Pueblo, Colo., on the brief), for appellee.

Before LEWIS, COTTERAL, and Mc-DERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge. In 1906 the appellee (defendant below) applied to the predecessor of appellant for a $10,000 policy of life insurance on the ordinary life plan, the annual premium for which was $266.90. The application was approved and a policy issued and accepted and the premium paid. Two months later the company discovered that a peculiar mistake had occurred in the policy issued. The printer had used the form for an ordinary life policy for the first page, but on the reverse side had erroneously used the form for an endowment policy. There were but a few words difference in the printed matter, but, as will be seen, they were of vital import. Each of them had a table of values, setting out the options given the assured at the end of each year, which must be filled in before issue. This table was filled out, in the policy issued, correctly, and under it the assured had the option, at the end of 20 years, of $3,040 in cash or paid up assurance for $5,110. But in the printed form of endowment policy issued, one of the later clauses provided that, at the end of 20 years, "the divisible profits may be added to the full amount assured and the total sum drawn in cash, the policy being surrendered." The result was that the assured, by the written in table, was given the option of $3,040 in cash, and in a later clause the option of $10,000 in cash. This was a patent and manifest absurdity. The plaintiff offered to prove that the premium for an

endowment policy was $508.90 instead of $266.90, the amount paid.

Upon discovery of this error the company called the defendant's attention to the error and asked to take the policy up and issue one that was in accord with the application. There was some trouble getting a reply from the defendant, but he finally wrote and said that the agent who took his application had stated that the policy applied for "would be more liberal and extend greater privileges than I could secure through the policy of any other company," and declined to surrender the policy for correction. The company wrote back insisting that the error should be corrected. The defendant is a doctor of intelligence and education, and had been a medical examiner for an insurance company, and knew what an ordinary life policy was. The record leaves no shadow of doubt as to his understanding of the mistake and his determination to enrich himself by it if possible.

Shortly thereafter the company issuing the policy sold out to the plaintiff, which did not in fact know of the error, although it was charged with the knowledge of its predecessor. The premium for an ordinary life policy was tendered each year, and accepted. The rights of the parties during the first 20 years of the policy were the same under either form of policy; that is, upon death during that period the beneficiary would be entitled to $10,000; and upon surrender of the policy during that 20 years the assured was entitled to surrender values as set out in the table, which were correct for an ordinary life policy. But at the end of 20 years, under the policy issued, the assured then, for the first time, had his option of $3,040 in cash or $10,000 in cash. He demanded the $10,000. Immediately thereafter this bill in equity to reform the policy was filed. The defenses were absence of mutual mistake or fraud; no antecedent agreement; acquiescence; negligence; laches; and the incontestable clause. The trial court denied the relief sought, holding that the mistake had not been established by the character and amount of proof required to reform an instrument; and, even so, that by letting the matter go for 20 years, the relief was barred by laches. This appeal follows. There is no substantial dispute as to the facts.

1. *As to mutual mistake or fraud.* The power of a court of equity to reform an instrument so that it will express the actual agreement of the parties, in case of mutual mistake, or mistake upon the part of one and fraud or inequitable conduct on the part of the other, is well recognized. Hunt v. Rhodes,

1 Pet. 1, 7 L. Ed. 27; Allen v. Hammond, 11 Pet. 63, 9 L. Ed. 633; Ivinson v. Hutton, 98 U. S. 79, 25 L. Ed. 66; Walden v. Skinner, 101 U. S. 577, 583, 25 L. Ed. 963; Thompson v. Phenix Ins. Co., 136 U. S. 287, 10 S. Ct. 1019, 34 L. Ed. 408; Philippine Sugar, etc., Co. v. Government of Philippine Islands, 247 U. S. 385, 38 S. Ct. 513, 515, 62 L. Ed. 1177. As to the proof required to accomplish such reformation, the Supreme Court of the United States, in the case last cited, held: "The burden of proof resting upon the appellant cannot be satisfied by mere preponderance of the evidence. It is settled that relief by way of reformation will not be granted, unless the proof of mutual mistake be 'of the clearest and most satisfactory character.' Snell v. Insurance Co., 98 U. S. 85, 89, 90, 25 L. Ed. 52; Baltzer v. Raleigh & Augusta Railroad, 115 U. S. 634, 645, 6 S. Ct. 216, 29 L. Ed. 505; Maxwell Land-Grant Case, 121 U. S. 325, 381, 7 S. Ct. 1015, 30 L. Ed. 949; Simmons Creek Coal Co. v. Doran, 142 U. S. 417, 435, 12 S. Ct. 239, 35 L. Ed. 1063; Campbell v. Northwest Eckington Co., 229 U. S. 561, 584, 33 S. Ct. 796, 57 L. Ed. 1330." Page 391 of 247 U. S., 38 S. Ct. 515, 62 L. Ed. 1177. See, also, Firemen's Ins. Co. v. Lasker, 18 F. (2d) 375 (8 C. C. A.); Skelton v. Federal Surety Co., 15 F. (2d) 756 (8 C. C. A.).

While, in an action at law, a party is bound by the terms of his contract, whether he has read it or not (New York Life Insurance Co. v. Fletcher, 117 U. S. 519, 6 S. Ct. 837, 29 L. Ed. 934; Lumber Underwriters v. Rife, 237 U. S. 605, 35 S. Ct. 717, 718, 59 L. Ed. 1140), in an action in equity to reform, failure to read the agreement is not itself a complete defense. In the case last cited, the Supreme Court of the United States said: "No rational theory of contract can be made that does not hold the assured to know the contents of the instrument to which he seeks to hold the other party. The assured also knows better than the insurers the condition of his premises, even if the insurers have been notified of the facts. * * * Of course, if the insured can prove that he made a different contract from that expressed in the writing, he may have it reformed in equity. What he cannot do is to take a policy without reading it, and then, when he comes to sue at law upon the instrument, ask to have it enforced otherwise than according to its terms. The court is not at liberty to introduce a short cut to reformation by letting the jury strike out a clause." Pages 609, 610 of 237 U. S., 35 S. Ct. 718, 59 L. Ed. 1140.

Chancellor Kent expressed the rule as

follows: "But equity has a broader jurisdiction, and will open the written contract to let in an equity arising from facts perfectly distinct from the sense and construction of the instrument itself." Gillespie v. Moon, 2 Johns. Ch. (N. Y.) 585, 7 Am. Dec. 559.

In speaking of mutual mistake, Williston in his work on Contracts (vol. III, p. 2745) says that "knowledge by one party of the other's mistake regarding the expression of the contract is equivalent to mutual mistake."

While courts are properly reluctant to alter the terms of a written engagement, even in equity, and do not do so unless the proof is clear and convincing, we are of the opinion that the uncontradicted and indisputable facts in this case require the interposition of equity. It is true the defendant on the stand and in his letters denies any mistake on his part. But his actions speak louder than his words. He applied for an ordinary life policy; without any quibble, and in response to his application, he received a policy that manifestly was in error. He only paid for an ordinary life policy. When he received the policy he either did or did not notice the error. If he did not notice it, the mistake was mutual. If he did notice it and said nothing, he was guilty of such inequitable conduct as to amount to fraud. A man presents a check for $100 to a bank teller; he gets two $100 bills. No matter how loudly he asserts the lack of mistake on his part, the fact still remains that he was either mistaken or was trying to benefit by the teller's mistake. Without resorting to any oral evidence, the papers in this case on their face bear conclusive proof of a mistake that can be and should be corrected in equity.

2. *Lack of antecedent agreement.* It is quite true that before a writing may be reformed to express the real agreement of the parties, the parties must have agreed. Rescission may sometimes be had because there is no agreement; but reformation necessarily implies an agreement. Travelers' Ins. Co. v. Henderson, 69 F. 762 (8 C. C. A.); Southern Surety Co. v. United States Cast Iron Pipe & F. Co., 13 F.(2d) 833 (8 C. C. A.). From this premise, counsel argues that, since the policy issued did not conform to the application, the policy was only a counter offer, and there was therefore no antecedent contract. This ingenious argument, if sound, means there never can be a reformation of a policy of insurance issued on an application. The wilderness of cases in the books reforming policies so as to make them conform to the application is sufficient answer to the argument. In the early case of Ivinson v. Hutton, 98 U. S. 79, 25 L. Ed. 66, the court said, speaking of reformation of instruments generally: "Controversies of the kind often arise in respect to policies of insurance; and the rule is, when once the contract is agreed to, the underwriters are bound to insert it in the policy, and if they omit to do it, the insured have a right to insist upon a perfect conformity to the original agreement. Canedy v. [Marcy] Morey, 13 Gray (Mass.) 377; Wake v. Harrow, 1 Hurlst. & Colt. 202." Page 84 of 98 U. S., 25 L. Ed. 66.

In the case last cited there was no formal antecedent agreement. Two partners had agreed to settle their affairs upon the basis of an audit made by a clerk. The audit was made, and a settlement agreement was executed and delivered in accordance therewith. It was then discovered that the clerk had made a clerical error of some $4,000. The Supreme Court found no obstacle to reforming the agreement of settlement, and yet the antecedent agreement was more vague and uncertain than the one here involved.

The logical answer is that when the company approves the application as made, and issues a policy, it manifests its intention of accepting the application. There is, at that moment, a meeting of the minds—an agreement to issue the policy applied for. A statement of the general rule may be found in 32 C. J. 1103, supported by a wealth of authority: "Conversely an unconditional acceptance by the company of an application for insurance completes the contract and makes it binding on both parties, without the issuance or delivery of a policy, unless the application otherwise provides; and, a fortiori, the contract becomes perfect and mutually obligatory where not only is the application accepted, but also a policy is issued and unconditionally deposited in the post office for transmission to the applicant, either directly or through an agent of the company. The foregoing rule as to the effect of an acceptance applies where a condition, if any, as to payment of the first premium has been complied with or waived, and, where, the application is for life insurance, there has been a satisfaction or waiver of a condition, if any, that the state of the applicant's health is the same at the time of acceptance as when the application was made."

In the ordinary case a policy of fire insurance is issued on a written application, and the policy misdescribes the property, or its location, or the assured's interest therein. Reformation, to make it correspond to the application, follows almost as a matter of

course. Yet defendant's ingenious argument, if sound, would render powerless the courts of equity to rectify any such error.

■ 3. *Acquiescence.* The defendant claims that the company acquiesced in the error. Quite the contrary. It insisted on the existence of the mistake from the first to the last. It is true that it accepted premiums for 20 years. But the premiums tendered it were in payment of an ordinary life policy, which it claimed was the real agreement of the parties. Acceptance of premiums may be inconsistent with a claim of rescission on the ground of no contract; but it is not inconsistent with a claim of reformation, when the premiums tendered and accepted are the premiums payable under the company's contention. Under the ordinary life policy, the insured had a right to pay his premium each year, and the company was bound to accept it, or carry the risk of his death for nothing.

The cases cited by appellee in support of this contention are entirely distinguishable, for they are cases where a company, denying any liability, accepted premiums. Here the company does not deny liability—it admits it; here the company does not claim the contract has been voided—it insists it is in force; here the company is not seeking to rescind— it seeks to reform.

■■ 4. *Negligence.* It is claimed that the company was negligent in failing to discover the error, and attention is called to a statement on the policy reading: "Examined by J. M. S." Apart from the question whether negligence must be accompanied by prejudice, it is sufficient to say that negligence is not in itself a defense, else there would be no ground for reformation for mistake, as mistakes nearly always presuppose negligence. The negligence, if any, consists in not reading, line for line, the printed form, or of failure to notice the word "Endowment" at the bottom of the table of values. The Supreme Court of the United States, in a case where the company set up the negligence of the assured, held: "The situation being thus, we are unable to concur in the view that McMaster's omission to read the policies when delivered to him and payment of the premiums made constituted such negligence as to estop plaintiff from denying that McMaster by accepting the policies agreed that the insurance might be forfeited within thirteen months from December 12, 1893. Supreme Lodge K. of P. v. Withers, 177 U. S. 260, 44 L. Ed. 762, 20 S. Ct. 611, and cases cited; Fitchner v. Fidelity Mut. F. Asso., 103 Iowa, [276] 279, 72 N. W. 530; Hartford Steam Boiler Inspection & Ins. Co. v. Car-tier, 89 Mich. 41, 50 N. W. 747." McMaster v. New York Life Ins Co., 183 U. S. 25, 39, 22 S. Ct. 10, 15, 46 L. Ed. 64.

This case reversed the Eighth Circuit Court of Appeals on appeal from a second trial of the same litigation as came first before the Court of Appeals of the Eighth Circuit in New York Life Ins. Co. v. McMaster, 87 F. 63, relied upon by defendant in the court below; and comes to a conclusion contrary to that of the Circuit Court.

In Skelton v. Federal Surety Co., 15 F. (2d) 756, 759, Judge Booth, speaking for the Eighth Circuit Court of Appeals, held:

"Mere negligence, not amounting to the violation of a positive legal duty, does not prevent reformation, and especially if it appears that the other party has not been prejudiced thereby. Pomeroy Eq. Jur. (3d Ed.) § 856; Pomeroy Eq. Rem. § 680; 34 Cyc. 948; Farwell v. Home Ins. Co., 136 F. 93, 97, 68 C. C. A. 557; Shields v. Mongollon Expl. Co., 137 F. 539, 549, 70 C. C. A. 123; Benesh v. Travelers' Ins. Co., 14 N. D. 39, 103 N. W. 405, 407.

"The negligence of Martin, under the circumstances disclosed, was a mere inadvertence. It did not rise to the dignity of a violation of a positive legal duty. Nor was appellant prejudiced thereby, for the evidence clearly and convincingly shows, as already pointed out, that appellant understood that he was indemnitor as to both bonds; that he recognized his liability while the contract was being performed, and after it had been completed." Page 759 of 15 F.(2d).

We have examined the record and find no negligence sufficient to bar recovery.

5. *Laches.* The most troublesome question in the case is that of laches. It is true that the plaintiff in error, or its predecessor, knew of this error for 20 years, and brought no action to rectify it. It does not appear that the defendant was prejudiced by this delay. The defendant testified that, because he held this policy, he let others lapse; but he cannot seriously contend he lapsed these other policies on the hope of some day getting more than he asked for or paid for from this policy; and if he did, and is disappointed, the prejudice results not from the delay but from his ill-begotten hope. The defendant appeared and testified, and apparently no other witness could have shed any light on the facts. Does this delay, standing alone, bar relief?

■ Laches is an equitable defense, and broadly speaking is controlled by equitable considerations. Questions of prejudice or lack of prejudice resulting from the delay,

the character of the property involved, as to its being fixed or fluctuating in value, and other matters enter into the equation. It has been held that the doctrine is dependent upon the circumstances of each case. Spiller v. St. Louis & S. F. R. Co., 14 F.(2d) 284 (8 C. C. A.); Taylor v. Salt Creek Consol. Oil Co., 285 F. 532 (8 C. C. A.). Many years ago Judge Walter H. Sanborn held that: "In the application of the doctrine of laches, the settled rule is that courts of equity are not bound by, but that they usually act or refuse to act in analogy to, the statute of limitations relating to actions at law of like character. * * * The meaning of this rule is that, under ordinary circumstances, a suit in equity will not be stayed for laches before, and will be stayed after the time fixed by the analogous statute of limitations at law; but if unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer, period than that fixed by the statute, the chancellor will not be bound by the statute, but will determine the extraordinary case in accordance with the equities which condition it." Kelley v. Boettcher (C. C. A.) 85 F. 55, 62,

It was held in O'Brien v. Wheelock, 184 U. S. 450, loc. cit. 493, 22 S. Ct. 354, 371, 46 L. Ed. 636, that: "It is not a mere matter of lapse of time, but of change of situation during neglectful repose, rendering it inequitable to afford relief." And in Southern Pacific Co. v. Bogert, 250 U. S. 483, 39 S. Ct. 533, 536, 63 L. Ed. 1099, where there was a delay of 22 years, that: "But the essence of laches is not merely lapse of time." See, to same effect, Northern Pacific Ry. v. Boyd, 228 U. S. 482, 33 S. Ct. 554, 57 L. Ed. 931; Spiller v. St. Louis & S. F. R. Co., supra, and cases cited therein.

In the light of the authorities cited and the undisputed facts in this case, it is not at all clear that the delay in asserting the right bars the relief sought, particularly in view of the inequitable attitude of defendant. But we have concluded that another circumstance, not referred to by the trial court in his oral opinion, governs the disposition of this case and makes it unnecessary to explore the doctrine of laches. The relief sought here is not an offensive relief; the relief sought is defensive—a defense asserted against a claim made for the first time a few months prior to the commencement of this suit. The error in the policy was not one that affected the plaintiff's rights when it was discovered. At that time the rights of the parties to the contract were the same under the policy issued and the one intended to be issued. The rights would remain the same for 20 years. If the assured died within that period, the error would not be material or prejudicial. Nor did the company know, at that time, that defendant would maintain his inequitable attitude for 20 years. For all anyone then knew, the defendant might undergo a change in heart during the years, and be content with what he asked for and paid for; and if so, no claim would ever arise. Or, he might lapse his policy during the stretch of years. In any such events, the error would never be material. Under such circumstances we do not believe it was incumbent on plaintiff to seek relief in the courts 20 years before a claim could possibly be made against it, and with a strong probability existing of a claim never being made. Or, to put it another way, if the plaintiff had awaited a suit against it, the defense of reformation would not have been foreclosed by laches; it should not be foreclosed because it promptly went into court to establish its defense when the claim was asserted.

This view is supported by the authorities. A case with analogous facts is that of Griswold v. Hazard, 141 U. S. 260, 11 S. Ct. 972, 35 L. Ed. 678. There one Griswold signed a bond on August 22, 1868, in fact guaranteeing the payment of any judgment rendered in a suit brought that day. He intended to sign a bond for the appearance of the defendant in court the following Monday. Within a few months of that day, "in the fall of 1868," he learned of the mistake. He brought an action to reform the bond on September 13, 1881. This was about the time the obligation on the bond he signed became fixed. The defense of laches was interposed because 13 years had elapsed between the discovery of the mistake and the action to reform. The Supreme Court held the defense not good, and said: "Besides, there was no absolute necessity for Griswold's moving in the matter until after some decree was passed against Durant, and until an attempt was made to hold him personally responsible for the amount of the bond. * * * Notwithstanding this announcement, and doubtless because of the intimation that the bond meant more, in law, than he supposed, Griswold commenced the present suit *more than a year before the decree was rendered against Durant, and before the action at law was brought on the bond.* Under the peculiar circumstances of this case we think the defense of laches is without substantial merit. Whether laches is to be imputed to a party seeking the aid of a court of equity depends

upon the circumstances of the particular case. There are no circumstances here that would justify a refusal to grant the relief asked because of Griswold's delay in instituting suit to have the bond cancelled or reformed." Pages 287, 288 of 141 U. S., 11 S. Ct. 981, 35 L. Ed. 678. So, in the case at bar, there was no necessity of plaintiff taking action until an attempt was made to hold it to the policy issued.

A case almost exactly parallel in its facts is Buck v. Equitable Life Ins. Co., 96 Wash. 683, 165 P. 878. There an erroneous cash surrender value was written into a policy. When the error was discovered the company tried without success to get the policy back for correction. For 15 years thereafter the premiums were paid. Then followed the demand for the higher surrender value, a refusal to pay, and a suit to reform. Relief was granted, and, as to laches, the court said: "It is suggested that, when it realized that a mistake had been made in the cash reserve valuation appellant should have taken some steps looking to a reformation of the policy. Appellant had indicated in its letter to respondent its purpose to recognize $408 as the guaranteed cash reserve value of this policy if continued in force for the 15-year period. It could not surrender the policy or cancel it, because there could not be any change if respondent should die before the expiration of the 15-year period nor after that period, unless respondent elected to exercise the option he only could exercise." Page 687 of 96 Wash., 165 P. 879.

Another case, similar on the facts, where relief was granted to correct a clerical error in the reserve value of a life policy, fifteen years after its date, is Hibbard v. North Am. Life Co., 192 Wis. 315, 212 N. W. 779.

The principles announced in Williams v. Neely (C. C. A.) 134 F. 1, 69 L. R. A. 232, are applicable. An action at law was pending on certain promissory notes. The defendants therein brought an action in equity to enjoin the law action and to establish certain claims in recoupment. Relief was denied by the trial court. On appeal, the Eighth Circuit (Sanborn and Van Devanter concurring) reversed the cause. It appeared that the demands sought to be recouped were barred by the statute of limitations. The court held this did not conclude the matter, and, speaking through Judge Sanborn, held: "This defense of equitable recoupment or reduction, if it were available at law, would have survived as long as the cause of action upon the note was available. If the holder of the note had invoked the aid of a court of equity to foreclose the mortgage which secured it, this defense would have conditioned his recovery there. Farmers' Loan & Trust Co. v. Denver, etc., R. Co., 60 C. C. A. 588, 593, 126 F. 46, 51. By analogy with these rules the complainants are not guilty of culpable laches in enforcing their defense as long as the action on the note survives. Indeed, they were not fairly chargeable with any laches as long as no action upon the note was commenced, because they might well rest in the belief that no action would be taken by Neely to collect it until his bond and the covenant of the vendor had been fulfilled, and the incumbrances upon the title and the defense to the note had been alike removed." Page 13 of 134 F., 69 L. R. A. 232. To the same effect, see Ramsden v. Keene Five Cents Savings Bank, 198 F. 807 (8 C. C. A.).

We conclude that laches is not a bar to the relief sought.

6. *The Incontestable Clause.* Both the policy applied for and the one issued provide, in substance, that "after one year from date hereof this policy shall become incontestable," save for nonpayment of premiums. It is claimed that this provision bars this action. The contention is not sound. This is not a contest of the policy, but a prayer to make a written instrument speak the real agreement of the parties. It would hardly be suggested that an assured, who brings an action to reform a policy and to recover under it as reformed, was contesting the policy within the meaning of this clause. Yet the clause is not one-sided, and the right of the assured to have the writing express the agreement actually made is no greater than the right of the assurer. We have found no authority upon the point, although there are many decided cases involving the construction and scope of the clause. Reference is made to Mack v. Connecticut General Life Ins. Co. of Hartford, 12 F.(2d) 416 (8 C. C. A.); Myers v. Liberty Life Ins. Co., 124 Kan. 191, 257 P. 933, 55 A. L. R. 542; Scales v. Jefferson Standard Life Ins. Co., 155 Tenn. 412, 295 S. W. 58, 55 A. L. R. 537, and the Annotation in 55 A. L. R. 549, for general discussions of the clause. Without going at length into the purpose and history of the clause and without intimating that an actual contest may not be found under the cloak of reformation, we hold that an action to correct a purely clerical error in a policy issued, so that it will speak the truth as to the agreement of the parties, is not barred by the incontestable clause.

It follows that the decree should be and is reversed, with directions to grant the relief prayed for.