## INTERNATIONAL HARVESTER CO. v. MISSISSIPPI LAND CO.*

### No. 8812.

Circuit Court of Appeals, Eighth Circuit.

Aug. 13, 1930.

See also 25 F.(2d) 355.

George W. Morgan and Frank B. Kellogg, both of St. Paul, Minn. (Cleon Headley, of St. Paul, Minn., Edward R. Lewis, of Chicago, Ill., and Kellogg, Morgan, Chase, Carter & Headley, of St. Paul, Minn., on the brief), for appellant.

Charles W. Briggs, of St. Paul, Minn. (C. E. Elmquist and Clapp, Richardson, Elmquist, Briggs & Macartney, all of St. Paul, Minn., on the brief), for appellee.

Before KENYON, BOOTH, and GARDNER, Circuit Judges.

KENYON, Circuit Judge.

This is an action to reform the tax covenant of a mining lease, on the theory that at the time it was executed appellant (International Harvester Company) did not understand the legal effect of such covenant, due to inequitable conduct on the part of appellee (Mississippi Land Company). In 1901 and 1902 appellant entered into two thirty-year leases with appellee to mine iron ore on two adjoining forties constituting the so-called Hawkins Mine. These leases contained the following provision:

"The lessees shall pay all taxes and assessments, ordinary and extraordinary, general and specific, which may be levied or assessed upon lands demised hereby, and on the iron ore mined thereon, and all personal property and improvements thereon."

In 1922 appellant opened negotiations with appellee for a new lease. It desired to make certain developments, for the successful accomplishment of which more time was needed than was provided by the existent leases. After a few months these negotiations were dropped. They were renewed in 1924 at the initiative of appellant. After many conferences were held between the representatives of the harvester company and the land company, a draft of a new lease was prepared by counsel for the land company and submitted to the harvester company. Several redrafts of this lease were prepared by representatives of both companies acting together, and the new lease was agreed upon and executed May 21, 1924, the tax covenant of which, productive of this controversy, was as follows:

"The Lessee further covenants to pay all taxes and assessments, ordinary and extraordinary, general or specific which may or shall

be levied or assessed upon the demised lands and on the iron ore mined and unmined thereon, or on account of any and all ore taken out or mined hereunder, including any so-called Tonnage or Occupational Tax thereon, and upon, against, or on account of any ore in stockpile or otherwise, or on account of any and all buildings, improvements, structures, personal property, or other property made or placed upon said lands by the Lessee, its successors or assigns."

In 1921 the Legislature of Minnesota passed what was termed an Occupational Tax Act (Laws Minn. 1921, c. 223), which imposed a tax on operators of iron mines equal to 6 per cent. of the value of the ore, less cost of mining and royalties.

In 1923 the Legislature ·passed the so-called Royalty Tax Law (Laws Minn. 1923, c. 226), which provided a 6 per cent. tax on royalties to be returned and paid by the lessor. The constitutionality of this act was sharply contested in the courts, and cases commenced in 1923 raising the question were pending during the period of negotiation for the new lease. June 7, 1926, the royalty tax was sustained by the Supreme Court of the United States in Lake Superior Consolidated Iron Mines v. Lord, 271 U. S. 577, 46 S. Ct. 627, 70 L. Ed. 1093, and held to be a tax upon an interest in land.

August 30, 1926, appellee made a demand on appellant for payment of the royalty taxes for the year 1923 under the old leases, and for 1924 and 1925 under the new lease. Up to this time no demand had been made upon the harvester company to pay this tax. It refused to accede to the demand, and the land company brought action against it in the courts of Minnesota, claiming that under the terms of the old and the new leases lessee was liable to the lessor for the amount of royalty tax paid by it. ·The trial court decided in favor of the harvester company on the theory that the omission to expressly require payment of the royalty tax by the lessee made it clear that the lessee was not liable therefor. A number of test cases involving somewhat similar questions reached the Minnesota Supreme Court, and the view of that court is expressed in Marble v. Oliver Mining Co., 172 Minn. 263, 215 N. W. 71, 73, in which its principal opinion was filed, as follows: "The royalty tax being an imposition upon the lessor's interest in land demised for ore mining, payment of that tax falls upon the lessee under the plain and unambiguous language of the covenant in the lease."

In the case of Mississippi Land Co. v. International Harvester Co., 172 Minn. 273, 215 N. W. 181, the court in a supplementary opinion said: "Forceful arguments are made that the covenant quoted from the last lease cannot be held to obligate the lessee to pay the tax in question. It is said the lease enumerated the occupational tax which under no pretense could be considered as falling upon the lessor, and a possible tonnage tax not in existence, but did not refer to the royalty tax then in existence. We are, however, of the opinion that the covenant quoted so clearly includes all imposition of taxes and assessments against the right, title and interest of plaintiff in the demised premises that the same result as in the Marble Case must follow."

The judgment of the trial court was reversed on July 22, 1927. Subsequently the District Court 'entered judgment against the harvester company for some $70,000 for royalty taxes for the years 1923, 1924, 1925, and 1926, which it paid in full. November 15, 1927, it filed a bill in the United States District Court for the reformation of the tax provision of the lease of 1924, on the ground of mutual mistake. After pleas in the nature of a demurrer and in bar by appellee claiming an estoppel by virtue of the decision of the Supreme Court of Minnesota had been decided by Judge Sanborn adversely, appellant amended the original bill and claimed that it was entitled to have the tax covenant of the 1924 lease reformed by excluding any liability on its part to pay the royalty tax, on the ground that it had misapprehended the legal effect of the tax provision of the lease, due to appellee's inequitable conduct. The trial court decided against the harvester company's contention and dismissed the suit for want of equity.

The theory of appellant is that to properly express the intentions of the parties, after the words "upon the demised lands" in the tax clause of the lease should be inserted some such words as "other than the so-called royalty tax"; that appellee, through its officers, maintained a policy of silence as to the tax provision when it should have spoken and is now estopped by such conduct to say that its understanding and belief as to said provision was different from appellant's. Appellant's theory of the inequitable conduct of appellee with reference to its acts or omissions is stated by it as follows: "(a) Acts or omissions on its part during the negotiations which it knew or should have known would induce the lessee to execute the lease in the belief that assumption by it of the royalty tax in any contingency, did not enter into the bargain; and (b) the fact that the lessor

knew or suspected the different intent and understanding of the plaintiff and, with this knowledge or suspicion, kept silent to its own advantage." Mr. Perkins, vice president of the harvester company, Mr. Elliott, general counsel, and Mr. Batchelder, engineer, who represented it in the negotiations leading up to the making of the lease, all testified that it never occurred to them that the lessor expected the harvester company to assume the royalty tax, and that the lease was executed on their part in the belief that the royalty tax did not enter into the negotiations at all.

The theory of appellee is that if there was any mistake of law on the part of the appellant it was that it misconstrued the royalty tax under the law of the state of Minnesota as one to be imposed on royalties and not on lands, and that it had no knowledge of appellant's misapprehension of the law, nor was it in any way responsible therefor. Mr. Weyerhaeuser, Mr. Clapp, and Mr. Bell, officials of appellee, gave evidence to sustain this theory.

There is little dispute about the law applicable to the situation here presented. The difficulty is in the application thereof to the facts. Both parties quote and rely on provisions of section 847, vol. 2, Pomeroy's Equity Jurisprudence, which may be accepted

"Whatever be the effect of a mistake pure and simple, there is no doubt that equitable relief, affirmative or defensive, will be granted when the ignorance or misapprehension of a party concerning the legal effect of a transaction in which he engages, or concerning his own legal rights which are to be affected, is induced, procured, aided, or accompanied by inequitable conduct of the other parties. It is not necessary that such inequitable conduct should be intentionally misleading, much less that it should be actual fraud; it is enough that the misconception of the law was the result of, or even aided or accompanied by incorrect or misleading statements, or acts of the other party. When the mistake of law is pure and simple, the balance held by justice hangs even; but, when the error is accompanied by any inequitable conduct of the other party, it inclines in favor of the one who is mistaken. The scope and limitations of this doctrine may be summed up in the proposition that a misapprehension of the law by one party, of which the others are aware at the time of entering into the transaction, but which they do not rectify, is a sufficient ground for equitable relief. A court of equity will not permit one party to take advantage and enjoy the benefit of an ignorance or

mistake of law by the other, which he knew of and did not correct."

23 Ruling Case Law, p. 331, § 22, states the rule:

"There is, however, still another class of cases; that where one party to an instrument has made a mistake and the other party knows it, and conceals the truth from him. Such inequitable conduct accompanying a mistake is generally held to be a sufficient ground for reformation of the instrument in question."

This court in Dustin Grain Co. v. McAllister, 296 F. 611, discusses estoppel by silence, and all of the statements of the decisions and text books on the subject are merely the doctrines of honest and square dealing. A party may by remaining silent when he should speak be estopped to break that silence when he would speak.

Appellant accepts the clear statement of the trial court as to the equitable principle here involved as follows:

"Where one of two contracting parties entertains a mistaken view upon a question of law affecting his rights or obligations under the contract in question, and such mistake is induced or brought about by such conduct of the other as makes it inequitable on the part of the latter to take advantage of such mistake, equity will afford relief."

If the theory of appellant is correct an unconscionable advantage has been taken by appellee, yet appellee's witnesses are complimented a number of times in the brief of counsel for appellant as men of character and standing but who have been subconsciously impelled by self-interest to do or fail to do certain things which in equity and good conscience they should or should not have done in the negotiations leading up to the lease. Neither conscious fraud, misrepresentation, or undue influence is charged. Remaining silent is the gravamen of appellee's offense. During the time of the negotiations the constitutionality of the royalty tax was being sharply contested in the courts. It was, of course, a matter of intense interest, both to lessors and lessees of mining properties in the state of Minnesota. Mr. Perkins, one of the signers of the lease in question, on behalf of his company, testified that he knew of the passage of the royalty tax act in 1923 and knew of the contest being waged in the courts concerning it, but that he thought it did not interest his company, that it was a fee owner's fight, and that under the covenants in the existing leases his company could not be obligated to pay royalty taxes. Mr. Elliott,

general counsel of the harvester company, testified: "I considered it as a tax placed on royalties by its statutory name, and an endeavor to put a burden on the lessors corresponding with the occupation tax on the lessee. * * * It never occurred to me that it was a land tax. I never thought it might be construed to be a land tax. It imposed a tax on the royalties." Mr. Elliott was of course a lawyer of ability, experience, and distinction, or he would not have been general counsel of the harvester company. Before becoming general counsel he in connection with others had charge of the company's tax matters. He was familiar with the tax laws of the various states where the company operated. He took a prominent part in the negotiations leading up to the making of the new lease and passed on the legal questions for his company.

The first conference concerning a new lease was held in January, 1924. Appellee's officials on the very day of the conference talked over among themselves the question of this royalty tax and evidently approached the conference in the belief that if the tax was held to be one on land it would have to be under the terms of the old leases paid by appellant, and hence decided not to raise the question. The land company was trying to get the highest royalties it could extricate, and it was willing to take its chances on the question as to where the tax would eventually fall.

Appellant's representatives approached the negotiations which had been initiated by them believing the Royalty Tax Law would be held to be unconstitutional, and if not that the tax in question would be held to be a tax on royalties and not a land tax, and in such event it would not be concerned, as such tax would clearly have to be paid by the land company. They were likewise willing to take chances as to the tax, and did not care to bring up the subject.

The negotiations concerning the new lease lasted nearly five months before it was signed, and during all that time, according to this record, not a word was said or written by the negotiators as to the royalty tax, the payment of which would be one of the most important matters to determine if there were any question as to which party should pay it. Fundamental changes in the old leases were talked of, royalties were discussed, and finally fixed at a greatly advanced figure from the old leases. The problem of the use of the "grizzly," an apparatus to separate rock contents from crude ore being weighed in for royalty payments, seems to have been considered at length. The question of the "breccia," being strata of loose ore, was fully discussed. Many suggestions of changes were made and agreed to. The evidence shows that Mr. Elliott came to one of the conferences with thirty pencil notations of changes desired. Mr. Perkins testifies that from a simple list of a few changes desired "it became a volume." Operating problems, etc. were settled; much correspondence was had. Three different drafts of the lease were made. At least four different conferences were held. Every other subject connected with the proposed leases seems to have been discussed except the question of who should eventually have to pay the royalty tax running over a period of forty years and amounting to approximately $800,000. What is the explanation of this remarkable silence? Was it to intentionally mislead? Was it any one's duty to speak, and, if so, whose?

This record cannot be read without creating the impression in an unbiased mind that there was no frankness or candor on either side of the negotiations so far as the royalty tax was concerned. Of course, the frank thing, and what would be expected of great business concerns, would have been for their representatives freely to discuss the royalty tax and make perfectly clear who should pay it if it was sustained by the courts.

Appellant contends that it was misled by the silence of appellee's representatives; that it was their duty to speak and say what their intention was as to the royalty tax; that it was further misled by the transfer to the harvester company in the lease of the burden of the royalty tax, without mentioning it, by the use of language clear to the lessor, but not to the lessee; that the use of the words, "Tonnage or Occupational Tax" in the tax covenant was for the very purpose of deception and to throw appellant off its guard; that it was also misled by failure of appellee to demand until 1926 payment of the 1923 royalty tax, which claim we do not regard as substantial, the tax for 1923 not being due until June 1, 1924, and the new lease being executed on May 21, 1924.

Appellee's answer to the charge that the term "Tonnage or Occupational Tax" was employed to deceive appellant and throw it off its guard is that the provision was taken from some other lease which it had made which was pleasing to it, and it was adopting it for its leases in general, and that as to the failure to refer in any way to the royalty tax it believed the tax provision of the old leases protected it if the royalty tax was held to be a tax on land, and as there was approximate-

ly eight years for the old leases to run it was content to have a similar provision in the new lease as to the harvester company paying taxes; that as the harvester company did not raise this question it assumed it was satisfied with a tax covenant in the new lease which placed upon it the same burden as to tax payments as the old leases; that the words "all taxes \* \* \* which may or shall be levied or assessed upon the demised lands" were used for the very purpose of covering all taxes including the royalty tax if it should be held to be a tax on lands. Mr. Weyerhaeuser, president of the land company, told Mr. Clapp, its counsel, to draw the lease so as to cover the royalty tax if it was declared to be a land tax. The occupational tax mentioned was a tax that the lessee would be required to pay. As to the legal effect, the term "occupational tax" was surplusage. Mr. Weyerhaeuser testified: "In our negotiations we felt that the probability of our having to pay the royalty tax was comparatively small and we were willing to overlook it and to take our chances. \* \* \* We intended to include in the terms of the tax covenant all the taxes that we intended the lessee to pay. We intended to include the payment of the royalty tax in the general language of the covenant if it were construed to be a land tax—determined to be a land tax." In reply to the question, "If it was your intention and desire to take this chance, as you have stated, as to this liability of a minimum of about $800,000, and also, of course, necessarily to have the lessee also take the chance with you, would it not have been natural for you to have discussed the matter with the lessee, who was the other party to this deal?" he answered, "I think not so long as we retained the exact tax clause,—substantially the exact tax liability in the tax covenant." Mr. Weyerhaeuser stated that from his viewpoint the land company was renewing the lease, extending a lease; that the old tax covenant was satisfactory; that they assumed that as the harvester company had asked for the extension of the lease and made no request concerning the old tax covenant provisions, the same were satisfactory to them.

Mr. Bell of the land company testified: "The idea was that the provisions of the old leases should be carried forward as to this point, that the lessee would be required to pay the royalty tax, if it were a tax upon the land. It was not that I told Mr. Clapp that I wanted it. It was just simply that it was a common agreement that this would be the right thing to do. That was my understanding and intention so far as I was concerned

that our attorney should so draft the clause that the obligations of the lessee, whatever they were, as to the royalty tax should remain the same. He had advised us at that time that if it were a tax on the land or on the demised premises the lessee would have to bear it. The intention was to carry the status of the tax paying just as it was in existence."

Mr. Clapp, counsel for the land company, testified: "It was the desire of the Land Company to carry forward the same liability that existed in the old leases, those of 1901 and 1902, into the new lease that was being negotiated for, as to taxes and particularly as to the payment of royalty taxes, if they were held to be taxes on land—the same tax provisions, particularly in so far as they might affect liability to pay royalty taxes."

Appellant was anxious to be relieved from its old leases. The time thereunder was not sufficient for the development it had planned. It had agreed in the old leases to pay all taxes and assessments, ordinary and extraordinary, general and specific, which might be levied or assessed upon the lands. It might have feared the result of attempting to have a distinct statement inserted in the new lease that appellee was to pay the royalty tax if sustained by the courts in view of this clear expression in the old leases, which would have required the payment of the royalty tax by appellant. If the question had been raised of appellee paying this tax, it is possible the royalties might have been made higher or the negotiations ended. There is no way of knowing. In any event, appellant's representatives remained silent. If it was the duty of the representatives of the land company in these circumstances to state to the representatives of the harvester company what they understood to be the law applicable to the tax covenant why was it not equally the duty of the harvester company's representatives to speak and to tell the land company's representatives what their idea was as to the law?

The tax covenant clause in the old leases was clear. Appellant there agreed to pay all taxes of every nature and description which might be levied on the lands, etc. The tax covenant in the new lease was substantially the same, although language was employed enlarging to some extent the provisions of the old leases. It is unimportant as to what the new lease may be termed. It was to take the place of the old leases, but undoubtedly was to meet changing and changed conditions. While drawn by the land company's counsel, both parties, through their counsel,

participated fully in the consideration thereof, so that the language of the lease is the language of both parties, and there should be no presumption under these circumstances indulged that the lease should be construed more strictly against the lessor. 35 C. J. p. 1182, § 478.

There is no ambiguity in the tax covenant clause of the new lease. The Supreme Court of Minnesota, in Marble v. Oliver Iron Mining Co., 172 Minn. 263, 215 N. W. 71 and in Mississippi Land Co. v. Harvester Co., 172 Minn. 273, 215 N. W. 181, from both of which we have heretofore quoted, so held.

Able counsel of appellant had the various drafts of the lease before him for many months. The fact that the tax covenant referred to tonnage or occupational tax which would be payable by lessee certainly would not deceive or mislead a lawyer as to the clear-cut provision to pay all taxes assessed upon the leased lands. Appellant while claiming after the execution of the lease that it was under no legal obligation to pay the royalty tax did not claim prior to filing its amended complaint in November, 1928, that it had been misled by any conduct of appellee. In response to the demand made by the land company upon it in August, 1926, for the payment of the tax, it wrote: "In reply we beg to say that neither under the tax covenant in those leases nor under any other provision of law are we obliged to pay the Minnesota royalty tax levied under chapter 226 of the Minnesota Laws of 1923."

We cannot escape the conclusion that each side to the controversy was willing to take its chances as to what the courts would hold as to the royalty tax and where the burden might eventually be placed under the tax covenant provisions of the leases, and that neither desired to bring up the question of having a specific declaration as to which party should assume it. There is to us no other explanation of the remarkable silence surrounding this transaction as regards the royalty tax. It is going far to say that under this evidence the land company officials should have known or suspected what was in the minds of the harvester company officials as to the law and hence should have disabused their minds of their erroneous ideas. We fail to discern just how the silence of the land company officials aided in any way the misapprehension of the harvester company officials as to the law, and we are not convinced under the evidence that such officials knew that the representatives of appellant were laboring under any misapprehension of law. While the failure of the land company to deal with entire frankness may be open to criticism, the harvester company in our judgment occupies exactly the same status. The representatives of appellant, if in doubt as to appellee's understanding of the tax covenant, could have ascertained it by inquiring of them. They evidently preferred to rely on their own judgment that under the tax covenant as proposed and written appellant would not have to pay the royalty tax. Appellant took the chance and lost, and having lost, it virtually asks the courts to make a new contract for the parties. Appellant is not asking to cancel this contract on the ground of fraud, which is apparently disclaimed, and appellee's officials are designated as honorable men. The contract itself provides that lessee may cancel it in two years upon written notice. Certainly the evidence shows that the land company never expected to pay the royalty tax if it should be held to be a land tax instead of a mere tax on income, and relied on the tax covenant of the new lease to impose such liability on lessee. How then can a court place this obligation upon one party to a contract in order to relieve the other from a very extraordinary burden unless satisfied that the fault was entirely appellee's. If the harvester company did labor under a misapprehension as to the legal effect of the tax covenant, the evidence does not show that the land company was aware of such misapprehension or that it did anything to bring about such misapprehension.

While there is substantial evidence in this record with all the inferences to be drawn therefrom to sustain appellant's theory, something more than merely substantial evidence is required to reform a written contract. The United States Supreme Court, in Simmons Creek Coal Co. v. Doran, 142 U. S. 417, 435, 12 S. Ct. 239, 245, 35 L. Ed. 1063, states the rule thus: "The jurisdiction of equity to reform written instruments, where there is a mutual mistake, or mistake on one side and fraud or inequitable conduct on the other, is undoubted; but to justify such reformation the evidence must be sufficiently cogent to thoroughly satisfy the mind of the court." In Southern Surety Co. v. United States Cast Iron Pipe & Foundry Co., 13 F.(2d) 833, 837, this court said: "It may be stated as a general rule that reformation may not be had on account of a mere mistake of law, but to this general rule there are certain well recognized limitations. A court of equity may grant relief where the parties having agreed to the terms of a contract, through a mutual mistake, or through a mistake of one and

fraud of the other, in reducing the contract to writing, fail to express the contract agreed upon and intended, but such mistake or fraud must be established by proof of the 'clearest and most satisfactory character.'" In Bailey v. Lisle Mfg. Co., 238 F. 257, this court, in considering the question of reforming a contract because of a mistake on one side and inequitable conduct on the other, pointed out that the burden of proof was upon complainant and that the evidence to reform must be plain and convincing beyond reasonable controversy. Mathis v. Hemingway (C. C. A.) 24 F.(2d) 951; Columbian Nat. Life Ins. Co. v. Black (C. C. A.) 35 F.(2d) 571.

The evidence here fails to meet that test. It is not of that convincing character necessary to justify the reformation of a written instrument. The trial court was right in dismissing the case for want of equity. Its decree is affirmed.