## TOKIO MARINE & FIRE INS. CO., Limited, v. NATIONAL UNION FIRE INS. CO.

### No. 448.

Circuit Court of Appeals, Second Circuit.
July 19, 1937.

Morgan & Lockwood, of New York City (Louis J. Wolff and Harding Cowan, both of New York City, of counsel), for appellant.

Powers, Kaplan & Berger, of New York City (Abraham Kaplan and George I. Gross, both of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

Appellant sued at law to recover loss upon a policy of reinsurance and appellee interposed an equitable defense seeking reformation of the insurance contract upon the ground that the policy had been issued through appellee's mistake and inequitable conduct by the appellant. The equitable issue was first tried and resulted in a decree reforming the policy and denying the appellant's claim for loss thereunder.

Both parties were insurance companies authorized to transact business in the State of New York. April 4, 1932, appellant issued to S. H. Kress & Co. a policy of insurance covering risks of windstorm, tornado, earthquake, and other perils in the amount of $29,745,000, for one year on buildings and merchandise in the United States and Hawaii. Liability for loss at each location was limited to $200,000. The premium paid was $39,660. On the same day the appellant reinsured a portion of the risk known as "excess cover" with the ap-

pellee. March 10, 1933, an earthquake occurred in California, resulting in property damage to the insured of $287,500, which was paid by the appellant; in this action it is sought to recover $187,500 from the appellee as reinsurer.

A binder, issued April 4, 1932, by appellee's New York office, provided reinsurance cover of $1,000,000 and bound the reinsurer "to pay only the excess over and above $100,000 by any one loss in and/or on any building and its contents." It was "binding until delivery of our respective policies at the office of Johnson & Higgins." The policy was issued July 1, 1932, by the appellee's home office in Pittsburg, was forwarded to its New York office, which delivered it July 5, 1932, to Johnson & Higgins, brokers for the appellant. It is clear from the binder that the parties intended that the appellant should retain liability for the first $100,000 at each location and that the reinsurance coverage should apply only to the second $100,000. Inter-office communications of the appellee at the time the binder contract was concluded show an explicit understanding, in which the appellant undeniably participated, of an exposure of $100,000 at each location before the assumption of any risk by the appellee. A typewritten list detailing the Kress & Co. locations throughout the United States was furnished to the appellee by Johnson & Higgins, showing 240 locations, of which only 81 indicated an exposed valuation in excess of $100,000. Evidence of communications between the parties concerning the binder agreement clearly establishes that its terms and limitations, specifically the excess provision of $100,000 for each location, were definitely comprehended and accepted.

Appellant, through Johnson & Higgins, prepared the formal terms of reinsurance which were incorporated in the final policy as issued. Seedorf of Johnson & Higgins, who did most in the preparation of the form, testified that, after a consultation with a member of his loss department, it was concluded that the contract as embodied in the binder was improvident and that under it the possibility of loss, if it existed at all, was remote at best. June 29, 1932, the form, consisting of three closely typewritten pages, was delivered to the appellee's New York office, which immediately forwarded it to the Pittsburg office, where it was received June 30 and was submitted to one Reilly for examination.

The form contained a change in terms from the original binder agreement which gives rise to the present controversy. Instead of providing, as the binder did, that the reinsurance applied only to "the excess over and above $100,000 by any one loss in and/or on any one building and its contents," the form stipulated that the reinsurance should not attach until the amount "by any one loss shall exceed $100,000, and then only for the amount of the excess over and above the first $100,000 due from the Reinsured Company in the case of each and every loss, but in no event exceeding the limit above mentioned." In other words, as the appellant insists, a liability for any and all loss from a single catastrophe in excess of $100,000 was substituted for the previous liability which embraced only the loss in excess of $100,000 at each location. It is admitted that between the date of delivery of the binder, April 1, 1932, and the delivery of the policy, July 5, 1932, no conversations or communications took place between the parties relative to any changes, amendments, deletions, or additions to the terms set forth in the binder. Moreover, it is not questioned that it was a well-settled practice of Johnson & Higgins in its dealings with the appellee to call its attention to important changes by the submission of new binders with the forms, a procedure which was admittedly not followed in this instance. There was no notice of any kind, therefore, other than that which the changed terms themselves conveyed.

On June 30, 1932, as we have said, the form was submitted to Reilly, whose duty and office it was to examine and approve daily reports. He reviewed the form, together with the application and the previous correspondence, and concluded that the line was in accordance with the original understanding and ordered that the policy be issued. The original policy issued by the appellant to Kress & Co. was canceled September 26, 1932, and a new policy was issued. Johnson & Higgins prepared a binder, transferring the reinsurance coverage, which it presented to the appellee. Without discussion of any sort and as a routine matter, the indorsement of substitution was annexed to the policy of reinsurance. The appellant continued in ignorance of the change in its reinsurance liability until August 14, 1933, when Johnson & Higgins asserted its claim against it.

The controlling facts of this case are clear and undisputed. The original agreement between the parties, as embodied in the binder, was definitely understood; Johnson & Higgins, acting for the appellant, knowingly affected a departure from that agreement in the form which it prepared and which it submitted to the appellee; this form, after examination and approval and with notice of the literal change in terms which it contained, was attached by the appellee to its final policy—but it did so under an undisputed mistake as to the legal import of the changed terms. It believed that the reinsurance coverage of the final policy and of the binder were the same.

The mistake was only on the part of the appellee and was in no sense mutual. Clearly, if this were an error uninduced by any conduct of the other party, the appellee would be in no position to complain. A misapprehension of the legal significance of the terms contained in the form would not entitle the appellee to relief if the form, as attached to the policy, constituted the original and only agreement between the parties. In such a case the appellee would have taken its chance as to the legal scope and interpretation of the agreement which it accepted and could not rely or defend upon its mistaken understanding. International Harvester. Co. v. Mississippi Land Co., 43 F.(2d) 17 (C.C.A. 8), certiorari denied 282 U.S. 905, 51 S.Ct. 333, 75 L.Ed. 797.

But here there was the previous agreement which the binder represented; and it was one which both parties unquestionably understood. The form submitted by Johnson & Higgins for incorporation into the final policy was the formalization of the earlier agreement. Ordinarily, a party had a right to rely upon the fact that the formal document prepared by the other will express their original and definitive agreement; he may expect and rely upon literal conformity if no notice to the contrary is given. Equitable Ins. Co. v. Hearne, 20 Wall. 494, 22 L.Ed. 398; Connecticut Fire Ins. Co. v. Oakley Bldg. Co., 80 F.(2d) 717 (C.C.A.6), certiorari denied 298 U.S. 687, 56 S.Ct. 954, 80 L.Ed. 1406; Home Ins. Co. of New York v. Sullivan Machinery Co., 64 F.(2d) 765 (C.C.A.10), certiorari denied 290 U.S. 633, 54 S.Ct. 51, 78 L.Ed. 551. Perhaps the appellee would not in all instances be in a position—certainly not as to changes considered unimportant—to rely blindly upon this implied representation of literal conformity since its recognized habit and duty was to examine and approve the forms which were presented to it. But there is no question here of a failure to observe the literal change which was made. The changed terms were examined but their legal import was misinterpreted. The change in legal effect, which we assume took place, was unquestionably important. Seedorf of Johnson & Higgins testified that it was the result of an office consultation where dissatisfaction with the scope of the binder agreement was expressed. Seedorf also testified that changes which were considered important were, as a matter of practice, indicated to the appellee by the submission of a new binder accompanying the form. Silence in this case was a direct affirmation of legal conformity to the agreement embodied in the binder. It was tantamount to a representation that no important departure had been made from the original and undisputed understanding.

Intention to deceive or actual fraud by the appellant is not claimed, though in the amendment to the cross-bill "inequitable conduct" is charged. We incline to think that the change made was such as to raise a reasonable inference of knowledge by the appellant of the mistake committed by the appellee. Mistake was implicit, it seems, in the silent acceptance of the altered agreement under the circumstances which prevailed. If that were so, reformation would follow as of course. Columbian Nat. Life Ins. Co. v. Black, 35 F.(2d) 571, 71 A.L.R. 128 (C.C.A.10); Williston on Contracts, vol. 3, § 1548. But there was no finding of such knowledge by the court below, and that is perhaps explained by the evidence that the appellee was in the habit of discussing with Johnson & Higgins any changes contained in the forms which were unacceptable to it. The fact still remains, however, that the submission of the form under the circumstances related entailed a representation, however innocent and unmalicious, which induced the appellee's mistake. We may question somewhat why the appellee's expert did not comment upon the literal change which it observed; that goes to the question of negligence which we shall presently consider. But there is no doubt that in approving the form, because of its belief of legal conformity with the binder, the appellee relied upon the appel-

lant's conduct. This reliance was justified because of the specific agreement already made, because of the utter silence maintained in respect to the change, because of the ambiguity—by no means negligible —which the changed terms contained, and because of the practice between the parties which required notice of such a substantial alteration. Connecticut Fire Ins. Co. v. Oakley Bldg. Co., supra.

■ The mere fact that the mistake made is one of law does not prevent reformation. Philippine Sugar Co. v. Govt. of the Philippine Islands, 247 U. S. 385, 38 S.Ct. 513, 62 L.Ed. 1177; Skelton v. Federal Surety Co., 15 F.(2d) 756 (C.C.A.8). Relief was granted in Griswold v. Hazard, 141 U.S. 260, 11 S. Ct. 972, 999, 35 L.Ed. 678, where a literal change in the terms of a bail bond altered the legal effect of the agreement, relative to the coverage of the bond, originally accepted. Though it appears that the party who drew up the bond was aware of the literal change and, quite likely, of the legal change, the decision was put on the ground that there was a mutual mistake as to the legal import of the altered terms. Snell v. Atlantic Ins. Co., 98 U.S. 85, 25 L.Ed. 52, is a similar case. A policy insuring cotton was involved. Both parties understood, and indeed the insured relied on the fact, that the policy was to cover cotton owned by a partnership, though the policy gave the name of one Keith as the insured. With this understanding, the policy, which did not in legal effect embody it, was accepted. The insurer had made a representation of legal conformity which induced the insured's mistake. Once again the court spoke of mutual mistake which warranted reformation since the insurance company could not "obtain an unconscionable advantage through a mistake for which its agents were chiefly responsible." Though the facts of both cases are significantly similar to the ones here, we shall assume, as the court apparently did, that the mistakes of law therein were mutual.

Clearly, Johnson & Higgins labored under no mistake as to the legal consequences of the change which it effected. The appellee unquestionably did. It would be strange, however, if the appellant could now defend upon the ground that it fully understood what occurred despite the fact that by its wrongful representation, albeit unmalicious and nonfraudulent, it induced the mistake of legal conformity.

■ We have seen that a formal agreement will be reformed where it departs from the original understanding which that agreement was avowedly supposed to embody, where the mistaken party, justifiably relying on the expressed or implied representation of literal conformity, fails to observe and note the alterations. Equitable Ins. Co. v. Hearne, supra; Home Ins. Co. v. Sullivan Machinery Co., supra. The rule should be no different where the mistaken party, having noted the literal alterations, has just reason to expect a legal conformity which does not in fact exist. Conceivably, there may be situations where the literal alterations are so flagrant that the claim of mistake or, if there is a mistake, of justified reliance will be overridden. Certainly, not every show of negligence will bar reformation. Home Ins. Co. v. Sullivan Machinery Co., supra; Columbian Nat. Life Ins. Co. v. Black, supra; Skelton v. Federal Surety Co., supra. Indeed, mistakes warranting relief will more than often be accompanied by some lack of care or inadvertence. Numerous variables suggest themselves which may be dealt with as the occasion arises. Here we are satisfied that a representation of legal conformity was made on which the appellee had a right to and did rely and that equitable relief is justified.

Decree affirmed.

CHASE, Circuit Judge (dissenting).

As there was no mutual mistake and no fraud either claimed or found, the basis for the reformation of this insurance policy can be put, as it has been, only on the vague ground of inequitable conduct. At most, that rests upon the failure of Johnson & Higgins to comply with a rather thinly proved practice to call attention to any departures from the terms of a binder embodied in a superseding policy when they presented that to the defendant for approval. Had the defendant relied on any such custom and so been induced to approve the policy after but casual examination in the belief that only the binder risk was covered, there would, indeed, be some ground for reformation. But the facts are otherwise. Reilly, acting for the defendant, was an experienced expert on insurance contracts whose business it was to read policies submitted for the express purpose

of determining whether the defendant would sell the policy. He did read this one and knew exactly what language was in it. There is nothing to show that the policy was not in terms one which the defendant could, and would, issue for some premium and nothing to show that Reilly misunderstood the defendant's liability under it. What he did not fully comprehend was that the coverage was more extensive than that of the binder which limited one loss to one location while the policy did not. But what was the effect of that? Simply, of course, the basis for a higher premium rate. Even if we assume that there was some failure in the duty owed the defendant when Johnson & Higgins submitted the policy without notice of any change from the binder provisions, is it reasonable to believe that that failure brought about the actual issuance of the policy? There is nothing in this record to induce such a belief. Instead, notice of the change would at most have given the defendant express information that Johnson & Higgins understood that under the policy a greater risk for the same premium was being assumed than had been under the binder. Any possible reformation should be limited to an adjustment of the premium to make it commensurate, assuming without more that it was not, with a fair premium for the risk taken. But such relief is doubtful, for the defendant was not misled as to the amount of the policy premium.

The sort of reformation allowed here, and for reasons so advanced that I cannot find adequate support for them, fails to give effect to any equities which have arisen in favor of the plaintiff by reason of the defendant's conduct.

After such consideration as it, unhindered, chose to give the proposed policy, the defendant issued it. It allowed it to remain in force for a considerable time during which it caused it to be made applicable to a new primary policy and made no objection, whatever, to its terms until after a loss. Then for the first time, when it is too late for the plaintiff to get the reinsurance elsewhere which it had good reason to believe it had obtained from the defendant, the claim is made that the defendant is entitled to have the policy reformed; not because of any fraud; not because of a mutual mistake; not because of any mistake whatever as to the actual terms of the policy; but because of what really simmers down to a failure on the part of Johnson & Higgins to call the defendant's attention expressly to the fact that the binder did not provide the reinsurance wanted since it limited the excess coverage to loss measured by locations.

Reilly knew the policy didn't do that when he read it and, regardless of what obligations the defendant had, or had not, assumed under the binder, he knew what obligations it was assuming under the policy. He relied on his own expert judgment in approving the policy, and his mistake in believing that the policy risk was the same as the binder risk seems to me no just ground for remaking a contract which not only made the risk definite but which, no matter what had been done before, the parties understood was issued expressly for that purpose.

I would reverse the decree allowing reformation under the circumstances here disclosed.