THE HARTFORDSTEAM BOILER INSPECTION & INSURANCE COMPANY v. ANTOINE E. CARTIER.

*Insurance—Concealment of conditions of policy.*

1. Conditions and restrictions in insurance policies, to be binding upon the insured, must be inserted without fraud, misrepresentation, or concealment.

2. In order to charge the insured with the duty of an examination of his policy with reference to new matter introduced into it, he must be left free to discharge that duty unaffected by the company's representations, and not be led to neglect it by the conduct of the company itself. The company cannot be allowed to evade his questions, mislead him, suppress the truth, and lull him to sleep regarding new restrictions which it has injected into the policy, and thereafter charge him with constructive knowledge of the same.

Error to Mason. (Judkins, J.) Argued November 10 and 11, 1891. Decided December 21, 1891.

*Assumpsit.* Plaintiff brings error. Affirmed. The facts are stated in the opinion.

*Gilbert H. Blodgett,* for appellant, contended:

1. The defense outlined and followed was to show by parol evidence that the writing did not express the contract made by the parties, and this defense was admitted against the objections of plaintiff's counsel that it was immaterial, irrelevant, and tended to vary the terms of a written contract by parol evidence. There was no offer to show fraud or mistake, without which the evidence could not be considered; citing *Whitten v. Wright,* 34 Mich. 94; and fraud will never be presumed; citing *Miller v. Finley,* 26 Mich. 249; *Robert v. Morrin Estate,* 27 Id. 306; *Cranson v. Smith,* 37 Id. 309; *Darling v. Hurst,* 39 Id. 765; *Allison v. Ward,* 63 Id. 128.

2. This evidence showed that plaintiff and defendant had done no business with each other for two years past, and it was a new contract, and stood entirely unrelated to any prior transaction; citing *Brady v. Insurance Co.,* 11 Mich. 443.

3. Defendant did not inquire what rights he would have under the new policy as to cancellation. All witnesses substantially agree that he merely asked, "Suppose the other company comes along and wants to cancel this policy, how will it come out?" to which the agent replied, "I don't think they will; this is as low as it can be written without loss;" and defendant replied, "If that is the case, I will take out a policy." It was *rate* alone that the parties were considering, and the reply of the agent contained nothing to deceive or mislead the defendant. It was simply an expression of his opinion that the rate he had given was as low as could be made without loss, and the expression of such opinion was not such a representation as would entitle the defendant to rely upon it. and did not constitute fraud; citing *Buck v. Sherman,* 2 Doug. 182; *Berringer v. Cobb,* 58 Mich. 561; *Allison v. Ward,* 63 Id. 128, 137; *Lewless v. Railway Co.,* 65 Id. 292.

4. The court erred in permitting the defendant to answer the question, "Had you read this policy?" against plaintiff's objection that the same was immaterial and irrelevant, defendant being equally bound by the policy whether he had read it or not; citing *Cleaver v. Insurance Co.,* 65 Mich. 532, 71 Id. 417; Wood, Ins. § 503; *Pindar v. Insurance Co.,* 47 N. Y. 114.

5. There being no dispute as to the conversation with the agent, Brace, if the question of fraud was raised it was one of law for the court; citing Thomp. Trials §§ 1932, 1933, 1935, 2242, 2262; *Hardy v. Simpson*, 13 Ired. 132, 139; *Gage v. Parker*, 25 Barb. 141, 145; *Erwin v. Voorhees*, 26 Id. 127; *Sturtevant v. Ballard*, 9 Johns. 337, 342; *Gerrish v. Mace*, 9 Gray, 235; *Swift v. Fitzhugh*, 9 Port. (Ala.) 39; *Upson v. Raiford*, 29 Ala. 188; *Insurance Co. v. Crane*, 134 Mass. 56.

*M. B. Danaher*, for defendant, contended for the doctrine of the opinion.

McGRATH, J.   Suit is brought to recover the premium upon a policy of insurance, issued and delivered to defendant.

The policy was for three years, was dated February 14, 1890, was sent by mail to defendant, and received by him February 18.   The policy contained the following clause:

"This policy may also be canceled, at the request of the assured, in case of the sale, lease, transfer, or destruction of the boilers insured, or the buildings containing the same, or if the boiler or boilers shall cease to be used for a period of more than three months, provided the premium has been paid, in which case the company, after deducting the charges for inspection and the customary short rates for the time the policy has been in force, will return to the assured the remaining portion of the premium. But if this policy is delivered to or presented for cancellation through, by, or in the interest of any other boiler insurance company, no return premium will be paid."

The paragraph of the policy that contains the cancellation clause is in fine print

The application was solicited by plaintiff's agent, was made out in the presence of and delivered to the agent, and is as follows:

"Application for Insurance to the Hartford Steam Boiler Inspection & Insurance Company, of Hartford, Conn.

"Insurance is desired against loss or damage by explosion of steam-boilers on the property situated in Ludington, Mich., owned by A. E. Cartier, as a saw and shingle mill, and against loss of life and injury to persons, to the amount of $20,000.

                              "ANTOINE E. CARTIER,
                                   "Ludington, Mich."

The following appears on the back of the application:

" N. B.   *To Agents:* Indicate form of policy desired by its designating letter in the space provided below.
" Policy form: Special."

On the 4th day of March, 1890, defendant wrote to plaintiff, requesting it to cancel the policy, and plaintiff refused to comply. No reason was assigned for the request. The policy was sent to the company, but the company refused to treat it as surrendered. It appeared that this policy had been substituted for a policy which defendant held in another company, which is designated as the "American." Plaintiff's agent, one Brace, took the American policy, and allowed defendant $66.66 as its surrender value, and defendant agreed to pay the balance of the premium on the new policy of $133.33 on May 1 following.

Defendant's version of the transaction is as follows:

"*Q.* Could you state how many policies you have taken out in this company?

"*A.* Three.

"*Q.* Now you may state what became of those policies.

"*A.* The first policy that I took out with Mr. Brace here, the Hartford Insurance Company, he induced me to surrender the policy I had with the American company, which I did, because he gave me a better rate than I was getting with the American. Well, it wasn't but a little while after the Hartford got this policy from me, the agent of the American come around, and offered me a better rate I had got from them. So I canceled with the Hartford, and got the American.

"*Q.* How did you cancel; by letter, or in what way?

"*A.* The American Company, Mr. Brace took the

policy, and he wrote something on the face of it, stating that this policy was canceled, and the Hartford will take my risk,—something to that effect,—and then gave me credit. It was credited to pay on this policy, and it was. changed back and forth two or three different times.

"*Q*. Was that the course of business in each case?

"*A*. Yes, sir; it was with me. And this last policy that Mr. Brace got there he got me to take out, he says:. 'I will insure you for the same amount you carry on the five boilers, and will give you the same rate on eight boilers.' I says: 'If you get this policy out for me the American agent will come back and give me a better rate to cancel.' He says: 'They will not bother you, because we have got the best price; and they will never see you again.' I says: 'If that is the case, I will take out a policy.' I took out a policy, and let him have the other policy, and it wasn't but a little while when the American agent came, and I insured with them, and wrote the company to cancel this policy, and they refused to do it on some ground they had in this policy, that I didn't know anything about, which they never had before.

"*Q*. Had you read this policy?

"*A*. No, I never had. I merely read the face of it. Never read the by-laws.

"*Q*. Was there anything else said in regard to the policy,—any particular thing called to your attention in regard to the policy?

"*A*. At that time?

"*Q*. Yes, sir.

"*A*. Well, there was nothing more said then. There was previous to that,—that he would give me as good a policy, and in fact a better one, than I had before.

"*Q*. He said he would give you as good and in fact better than what you had before?

"*A*. Yes, sir; even what I had with the Hartford previous to that.

"*Q*. Better than the policies you had had with the. Hartford?

"*A*. Yes, sir.

"*Q*. Did he show you his form of policy with the fine print?

"*A*. No, sir; he didn't. I don't believe he had a form of the policy there. He had some form that was to paste on the face of the policy. I don't remember seeing the. policy,—that is, the form of it.

CROSS-EXAMINATION.

"*Q.* Did you ask Mr. Brace for the form of policy with the fine print in?

"*A.* I did not. I supposed the policy was the same .as the old one all the time.

"*Q.* Mr. Brace showed you this form of policy, this .special form?

"*A.* He showed me that form.

"*Q.* He said this was even better than the old ones .you had had before?

"*A.* He said the policy itself would be better than that what the policy I had from the company before was.

"*Q.* This was what he had and was showing you at that time?

"*A.* That is certainly what he did.

"*Q.* This policy was in your safe, that was received from the Hartford Company, was it not?

"*A.* Yes, sir; I received it. I don't know whether I ·can place the date. I know I received it after Mr. Brace was there.

"*Q.* Along about the 18th, wasn't it, Warren said?

"*A.* I couldn't say about the time; somewheres about the forepart of the month.

"*Q.* You had access to that safe?

"*A.* Yes, sir.

"*Q.* Could get at it whenever you liked?

"*A.* Yes, sir.

"*Q.* You had some talk with the agent of the American ·Company about insuring your property when he was there in March?

"*A.* Yes, sir.

"*Q.* And determined to take a risk with the American?

"*A.* I had not come to any conclusion to take any risk with him, but he gave me a better figure, and I told him I would cancel the Hartford policy, and when he came back I would probably take out a policy with him.

"*Q.* That was your reason for ever canceling the policy?

"*A.* Yes, sir; that was my intention,—in dollars and cents. * . * * There was nothing said about the cancellation clause any more than I said to Mr. Brace: 'If you take up this policy to-day, the American agent will be here by and by and take up yours.' He says: ·'We have got down where they can't get down any more.' This is the reason he gave me for it.

"*The Court:* What did he say about making the policy better?

"*A.* He said it was better. He didn't say there was a clause there to prevent me from canceling it. If he had, I wouldn't have changed my policy.

"*The Court:* Didn't say anything about that canceling clause?

"*A.* No, sir.

"*The Court:* When did you first discover there was a difference?

"*A.* I never discovered it until this suit was brought on. I wrote to the company to cancel my policy. At first they said they would cancel it. I wrote to them again, and they said they would cancel my policy by paying $133. I wrote back to them, and said I wouldn't pay them anything, because I had overpaid them for what time they had had my risk. Finally they offered to cancel it if I paid them $50.

"*The Court:* How many policies had you had with this company before this?

"*A.* I think this was the third policy.

"*The Court:* Did you cancel those policies?

"*A.* Yes, sir; that is, through the agent of the American Company. They canceled them, wrote something about canceling the policy on the face of the policy, and I signed my name to it, and the agent took it and sent it to the company,—to the Hartford,—and they canceled the policy, and gave me credit on the policy they had given me, as a premium that is paid in advance; and the Hartford has done the same thing three times.

"*Q.* You say you never read the fine print over in this policy?

"*A.* No, sir.

"*Q.* Did you ever read the fine print in any of your policies?

"*A.* Well, I have in some insurance companies, where we insure on property not on steam-boilers."

The agent Brace was called for plaintiff, and admitted the former dealings; that the other policies were cancelable; that he did not inform defendant of this change in the policy; and when defendant said to him, "'Suppose the other company come along and want to cancel

it,' I says, 'I don't think they will.   This is as low as it can be written, and save themselves.'"   This was a suppression of the truth.   This agent had with him, and exhibited to defendant, a special type-written clause which the old policy did not contain, and which was to be pasted as a rider upon the new policy.   This clause contained no reference to the cancellation clause.   The clause which is relied upon by the company was in fine print, and was new matter.   When defendant suggested the probability that the agent of the American would offer a better rate to cancel, the agent did not say to him that the new policy could not be surrendered and its surrender value recovered, but misled him, by giving as a reason that the rates were so low that they could not be cut.

Conditions and restrictions in insurance policies, to be binding upon the insured, must be inserted without fraud, misrepresentation, or concealment.   In order to charge the insured with the duty of an examination of his policy with reference to new matter introduced into it, he must be left free to discharge that duty unaffected by the company's representations, and not be led to neglect it by the conduct of the company itself.   The company cannot be allowed to evade his questions, mislead him, suppress the truth, and lull him to sleep regarding new restrictions which it has injected into the policy, and thereafter charge him with constructive knowledge of those restrictions.   The company obtained this very policy by inducing defendant to cancel a policy in the American; and, presumably to prevent the American from doing just what plaintiff was then doing, it introduces into the new policy a clause taking away a privilege which defendant had exercised under the old policies.   Not only was defendant's attention not called to this change, but, when asked with reference to an

exercise of the right of cancellation, plaintiff's agent neglects a plain duty, conceals the fact of change, and misleads and deceives the defendant. The question here is not as to the effect of a naked acceptance of a policy without examination, but as to whether, in the absence of actual notice, a party can be bound by a new restriction in a policy concerning the existence of which he has been lulled to sleep, and actually misled and deceived. In *Gristock v. Insurance Co.*, 87 Mich. 430, Justice GRANT, speaking for this Court, said:

"Plaintiff had a right to rely upon the assumption that his policy would be in accordance with the terms of his oral application. If the defendant desired to make it anything different it should, in order to make it binding upon plaintiff, under the authorities in this State, have called his attention to those clauses which differed from the oral application."

The same principle is applicable to the present case. There was no occasion for a stipulation in the written application that the new policy should contain this privilege. This application contained no reference to the subject. The form of the policy was determined by the agent by endorsement upon the back of the application. The agent's knowledge was the company's knowledge. The agent knew from the conversation had that defendant expected to get a policy similar in this respect to the policies which the company had already issued to him. Not only this, but the agent actually misled defendant when the subject of cancellation was referred to. The policy in this case contained no restrictions upon the authority or powers of the agent. The defendant set up fraud, misrepresentation, and concealment, and the testimony objected to was admissible under that plea. The court very properly left the questions raised by this

plea to the jury. The jury found for the defendant, and the judgment is affirmed.

MORSE, LONG, and GRANT, JJ., concurred. CHAMPLIN, C. J., did not sit.