EMPLOYERS' LIABILITY ASSURANCE CORP. *v.* GRAND
RAPIDS BRIDGE CO.

1. SAVING QUESTIONS FOR REVIEW—CASE TRIED TO COURT—RE-
QUEST FOR FINDINGS—EXCEPTIONS.

Where, in a case tried to the court without a jury, defendant
requests no finding of fact or law, and notes no exception to
the decision of the judge on the main question in the case,
that question is not open to review by defendant.

2. SAME.

Where an insurance company claims that insured's accept-
ance of the policy estops him from claiming that the applica-
tion is a part of the contract, an exception to the introduc-
tion of the application in evidence fairly raises the question
for review.

3. INSURANCE—APPLICATION AS PART OF CONTRACT—ACCEPTANCE
OF POLICY—WAIVER.

The receipt by the insured of a policy, and filing it away
without reading it, does not waive the right of the insured to
insist that the application is a part of the contract, where the
solicitor assured him, when taking it, that a copy of the ap-
plication would be attached to the policy, and that it would
not be necessary for him to preserve a copy.

4. COSTS ON ERROR.

Where both parties bring error, and the judgment remains un-
disturbed, no costs are awarded.

Error to Kent; Perkins, J.   Submitted October 20,
1904.   (Docket No. 61.)   Decided March 21, 1905.

Assumpsit by the Employers' Liability Assurance Cor-
poration, Limited, against the Grand Rapids Bridge Com-
pany for a premium upon a policy of insurance.   There
was judgment for plaintiff for less than the amount claimed,
and both parties bring error.   Affirmed.

*John E. More*, for plaintiff.

*Hatch & Wilson*, for defendant.

MONTGOMERY, J.  On the 24th day of April, 1901, the plaintiff was engaged in the business of insuring employers against liability for damages on account of injuries suffered by an employé while engaged in the work of the employer.  The different kinds of employment are classified, and insurance is written at different rates.  In employers' liability insurance the premium is determined by the gross amount of the pay roll and the rate.  For the reason that the amount of the pay roll cannot be determined with certainty for the future period covered by the insurance, it is necessary to estimate the pay roll, and determine the premium by multiplying the amount of the estimated pay roll by the rate appropriate to the particular occupation.  This estimated amount of pay roll may, at the end of the period covered by the policy, be found to be too great or too small, and it is customary to insert a provision in the policies of insurance of this sort that, if the actual amount paid exceeds the estimated amount mentioned in the policy, the assured shall pay the additional premium earned, and, if the amount actually paid is less than the estimated amount mentioned in the policy, the insurance company will return to the assured the unearned premium, *pro rata*, specifying a minimum premium which is to be retained by the insurance company in any event.

The plaintiff had established an agency in Grand Rapids, under the management of Mr. Charles L. Grinnell.  The defendant was engaged in the business of bridge building and structural work.  Wilmer H. Heath was an insurance solicitor and agent for a bond company in the office of Mr. Grinnell.  About the 21st of April, 1901, he went to the office of the defendant for the purpose of arranging with them for a bond to be given to the city on the East Bridge street culvert bridge.  In the application for the bond, inquiry is made if the applicant carries liability insurance.  Mr. Gaines, the manager of the defendant, said that they carried none, but were going to take out some.  Heath told him that he wrote that kind

of insurance, and would bring him up an application. He returned to Grinnell's office, and told Grinnell that the bridge company wanted some employers' liability insurance. He told Grinnell what the estimated pay roll was, and Grinnell entered upon a blank the particulars, viz., the period of the policy, the estimated amount of the pay roll, the rate, the amount of the premium, and the amount of the minimum premium. The estimated amount of the pay roll and the rate appeared in two places upon the application—in the upper right-hand corner, where appeared also the amount of the premium, and in paragraph 12, where appeared the estimated amount of the pay roll, the rate, and the minimum premium. This was the first application for employers' liability insurance that Heath had ever taken. Heath then took the application back to the bridge company, and showed it to Mr. Gaines, and filled out the remainder of the application from data furnished by Mr. Gaines. Heath explained to Gaines the method of arriving at the premium.

Before Gaines signed the application, he read it over very carefully, and figured out just what everything meant, and as to the pay roll they talked that, if there was anything over the $4,000, which had been fixed upon as the estimated pay roll, the bridge company was to pay 42 cents per hundred, and the minimum premium was to be $168. Heath made a copy of the application and gave it to Gaines. When Grinnell received this application, he sent it on to the insurance company, where it remained until the dispute arose which culminated in this suit.

The insurance company had issued a manual giving the classification of the different employments, and the rate appropriate to each. Mr. Grinnell had a copy of the manual, and upon examining it found the rate for bridge building to be $4.20 upon each $100 of the estimated pay roll. Upon filling the blanks in the application he computed the amount of the premium correctly at that rate, but in entering the rate of insurance he made the clerical error of writing 42 cents instead of $4.20. He made the same

mistake in paragraph 12, where the rate is also entered, and in that paragraph he also made the mistake of fixing the minimum premium at $168, which was the whole premium upon the estimated amount of the pay roll.

In due course the policy was delivered to the bridge company inclosed in an envelope, and was not examined by any of the officers of the company until the question arose which is to be determined in this suit. In the policy the rate is correctly stated to be $4.20 upon each $100 of wages, and the minimum premium is stated to be $25. The bridge company paid the premium of $168 shortly after the policy was delivered.

After the expiration of the policy Mr. Grinnell sent up to the office of the bridge company to ascertain the amount of the pay roll, so that settlement could be made, and, if the pay roll had exceeded the estimated amount of $4,000, he could collect the additional premium earned; if less than $4,000 had actually been paid for wages, he could return the unearned premium, pro rata, down to the minimum premium of $25. The amount actually paid for wages exceeded the sum of $4,000, and the insurance company demanded the premium upon the excess at the rate of $4.20 upon the $100. Mr. Gaines, the manager of the bridge company, produced his copy of the application, and claimed that the rate was 42 cents on the $100. The bridge company refused to pay, and this suit was commenced by summons in the justice's court December 23, 1902.

On the return day—January 2, 1903—the plaintiff filed its declaration in writing. The defendant pleaded orally the general issue. The case was tried before the court without a jury, and on February 10, 1903, judgment was rendered in favor of the insurance company, plaintiff, against the bridge company, for $203.99 damages, with costs of suit, taxed at $4.50. Defendant appealed the case to the circuit court, where the case was again tried before the court without a jury, and the court decided that the plaintiff was entitled to recover the premium upon the ex-

cess of wages paid beyond the estimated sum of $4,000, but only at the rate of 42 cents on the $100, which was computed at the sum of $21.71, and judgment was entered for plaintiff at that amount. Costs, however, were awarded to defendant bridge company, which were afterwards taxed at the sum of $32.40, and, setting off the judgment against the costs, it leaves a judgment in favor of defendant for $10.69. Neither party is satisfied with this result, and both ask this court to correct the errors made at the circuit.

There was no finding of facts or law called for, and no exception noted to the decision of the circuit judge on the main question by the defendant. The question is not, therefore, open to review by defendant under the repeated decisions of the court. *Wertin* v. *Crocker*, 47 Mich. 642; *Irwin* v. *Schlief*, 48 Mich. 237; *Haines* v. *Saviers*, 93 Mich. 440; *Gemberling* v. *Lazarus*, 100 Mich. 324; *Township of Cumming* v. *Shick*, 94 Mich. 222. The plaintiff would be similarly handicapped were it not for its exception to the admission of the original proposal for insurance in evidence. This exception fairly raises the question in the case, which is this: Did the acceptance of this policy, under the circumstances shown, estop the defendant from asserting that the entire contract was embodied accurately in the policy?

It is unquestioned law that the acceptance of a unilateral contract usually implies an assent to its terms. The question remains, however, as to whether the contract may be shown to have come into possession of the second party to it under circumstances showing that its terms were not assented to. It is to be noted in this case that there is no question of varying the terms of the contract by parol. The defendant's proposal was in writing. Not only was this so, but the solicitor assured defendant that it was unnecessary to retain a copy of the proposal, as a copy would be attached to the policy. Had a copy of the proposal, as made, been attached, it is clear that this would have constituted a part of the contract. Plaintiff's

agents attached something different, and delivered it to the defendant. Defendant did not read it. Has plaintiff, by this means, foisted upon the defendant a contract differing essentially from that which it engaged to deliver? There was no assent to this change. The question is ruled by *Gristock* v. *Insurance Co.*, 87 Mich. 428; *Hartford Steam Boiler Inspection & Ins. Co.* v. *Cartier*, 89 Mich. 41; *Dailey* v. *Accident Ass'n*, 102 Mich. 289 (26 L. R. A. 171).

The language of the supreme court of Connecticut in *Palmer* v. *Insurance Co.*, 54 Conn. 488, is so much in point, and so consonant with our view, that we quote:

" If the underwriter solicits a person to purchase of him indemnity against loss by fire, and if they unite in making a written draft of all the terms, conditions, and stipulations which are to become a part of or in any way affect the contract, and if the underwriter promises to make and sign a copy thereof, and deliver it as the evidence of the terms of his undertaking, and if a material and variant condition is by mistake inserted, and the variant contract is delivered, and the stipulated premium is received and retained, the court will not hear the claim that he is entitled to the benefit of the variant condition, where the other party had either actual or imputed knowledge of the change. In his promise to make and deliver an accurate copy, there is justification before the law for the omission of the other party to examine the paper delivered, and for his assumption that there is no designed variance. A man is not for his pecuniary advantage to impute it to another as gross negligence that the other trusted to his fidelity to a promise of that character."

The judgment is affirmed, but, as both parties appeal, and the judgment remains undisturbed, no costs will be awarded.

MOORE, C. J., CARPENTER, GRANT, and HOOKER, JJ., concurred.