GAMBLE v. WHITE et al.

CAMPBELL v. GAMBLE et al.

Nos. 451, 452.

Circuit Court of Appeals, Tenth Circuit.
March 10, 1932.

Ralph Randolph, of Dallas, Tex. (Locke, Locke, Stroud & Randolph, of Dallas, Tex., on the brief), for appellant Gamble.

C. R. Brice, of Roswell, N. M. (E. P. Bujac, of Carlsbad, N. M., and Manuel A. Sanchez, of Santa Fé, N. M., on the brief), for appellant Campbell.

J. O. Seth, of Santa Fé, N. M., for appellees L. W., W. W., and Harold R. White, and Sellmeyer.

Before COTTERAL and PHILLIPS, Circuit Judges, and JOHNSON, District Judge.

JOHNSON, District Judge.

The First National Bank of Carlsbad located at Carlsbad in the county of Eddy, state of New Mexico, failed in May, 1924. Shortly thereafter the Comptroller of the Currency appointed Sam D. Young receiver of the bank. He served until about the 1st of December, 1924, when the appellee George H. Sellmeyer was appointed. Sellmeyer served until October 1, 1927. A number of persons were appointed and have served as receiver of said bank since October 1, 1927. The last of this number is the present receiver, Joseph A. Gamble, appellant. He was appointed July 20, 1929. On the 29th of November, 1929, he as such receiver brought this suit in the court below against appellees and the appellant Campbell. The objects of the suit were: (1) To obtain judgment against appellant Campbell for the balance unpaid on his indebtedness to the Carlsbad bank. (2) To have a certain deed executed by Sellmeyer as receiver conveying to L. W. White, one of the appellees, 1,900 acres of land situated in Lea county, N. M., set aside. (3) To have a certain mortgage satisfaction and release executed by Sellmeyer as receiver set aside. (4) To have the released mortgage reinstated and adjudged a valid lien upon the lands conveyed by Sellmeyer to White, except as against certain innocent purchasers. (5) To have appellees account.

Appellant Campbell filed a cross-complaint in which he prayed for the same relief sought by Gamble, the receiver. He also prayed for money damages against Gamble as receiver. Both plaintiff and cross-complainant prayed for general relief. The ground of recovery relied upon by Gamble, the receiver, is an alleged fraudulent conspir-

acy between Sellmeyer and L. W. White. In his complaint, Gamble, the receiver, has stated the acts constituting this alleged conspiracy in great detail. This alleged fraudulent conspiracy is also charged by Campbell in his cross-complaint. In fact, the allegations of fraud in the cross-complaint of Campbell are in the identical language used by Gamble, the receiver, in his complaint. The following allegations found in the complaint and cross-complaint will sufficiently indicate the nature of the conspiracy charged:

"The said White, in the early part of 1925, became interested in acquiring the said land for himself at the low and relatively nominal consideration of to-wit, $500, which was substantially less than the fair value of said land at such time. He and the said Sellmeyer were friends, on intimate terms, and the said Sellmeyer became interested in enabling his friend to acquire the land at such low and relatively nominal consideration. In fact, the defendant Sellmeyer became interested in acquiring an interest in, or a part of, the said land on his own account and for his own benefit through the said White, if the latter should be successful in purchasing the same, and he and the said White then and there colluded and conspired to acquire the title to the said land, ostensibly in the name of the said White, but, in fact, though secretly, for the benefit of both the said White and the said Sellmeyer."

It is then alleged in substance and effect that the conspiracy was later carried out and the land transferred by Sellmeyer, as receiver, to White for the nominal consideration of $500; that this was accomplished without the consent or authority of the Comptroller of the Currency and through deception practiced upon the state court which authorized the sale.

The trial court dismissed the complaint of Gamble, receiver, as against appellees George H. Sellmeyer, L. W. White, W. W. White, and Harold R. White, and gave judgment against appellee Martin L. Campbell for the balance unpaid upon his notes given to the Carlsbad bank and held by the receiver Gamble. The trial court dismissed the cross-complaint of Campbell as to all parties.

Gamble, the receiver, has appealed from the judgment dismissing his complaint against the appellees named. Campbell has appealed from the judgment dismissing his cross-complaint.

The alleged errors relied upon by Gamble as receiver are that: (a) The evidence shows that Sellmeyer as receiver obtained the order of the district court authorizing the sale of the said land to L. W. White through fraudulent misrepresentation of the facts. (b) The evidence shows that no unconditional consent of the Comptroller of the Currency to the sale by the receiver was obtained and that the conditional consent of the Comptroller actually given by him was obtained and induced by Sellmeyer as receiver through concealment from the Comptroller of material facts. (c) The evidence shows a fraudulent conspiracy between Sellmeyer and L. W. White to obtain title to said land for their joint benefit. (d) The evidence shows that W. W. White and Harold R. White were not innocent purchasers.

In addition to the specifications of error of like import to those of Gamble as receiver as above noted, the appellant Campbell specifies in effect that the money judgment entered against him by the trial court in favor of the receiver is contrary to the evidence and against law. He also specifies in effect that the deed from the Federal Reserve Bank conveying said land to Sellmeyer as receiver to L. W. White was and is subject to his title as the equitable owner of the land.

The facts respecting the matters and transactions pertinent to these specifications of errors are:

Appellant Campbell was the owner of the land involved in this litigation. On the 31st day of May, 1923, he made and delivered to the Carlsbad bank a mortgage upon his land as security for the payment of an indebtedness to the bank of about $20,000. The bank also held a chattel mortgage on his cattle to secure this indebtedness. On January 26, 1924, this indebtedness was renewed by two notes given by Campbell to the bank payable May 30, 1924, one note for $12,000, another for $8,000, each with interest at the rate of 10 per cent. per annum from maturity. The mortgage on the land was subject to one previously given by Campbell to the Land Bank of Wichita, Kan., to secure an indebtedness to the Land Bank of $3,500. Prior to its failure in May, 1924, the Carlsbad bank had indorsed and delivered the Campbell note of $12,000 to the Federal Reserve Bank of Dallas, Tex. On the day following the maturity of the notes Campbell gave the Federal Reserve Bank a bill of sale of the cattle upon which the Carlsbad bank had the chattel mortgage. At the same time he executed a warranty deed conveying to the Federal Reserve Bank the land covered by the real estate mortgage held by the Carlsbad bank. The bill of sale expressly author-

ized the Federal Reserve Bank to sell the cattle mentioned therein and to apply the proceeds less the expense incurred upon the $12,-000 note. J. R. Nail, the representative of the Federal Reserve Bank who conducted the negotiations with Campbell, testified that the deed to the land was delivered upon the same understanding. He testified that both bill of sale and deed were obtained pursuant to the policy of the Federal Reserve Bank to expedite liquidation by direct sale if possible rather than through foreclosure proceedings in court. The Federal Reserve Bank sold the cattle transferred by the bill of sale and applied the proceeds less expenses upon the $12,000 note.

At the time of the failure of the Carlsbad bank, the Federal Reserve Bank held notes indorsed by the Carlsbad bank amounting to about $100,000. The Federal Reserve Bank also held collateral amounting on April 3, 1925, to about $75,000. On or about this date Sellmeyer, as receiver of the Carlsbad bank, paid the Federal Reserve Bank $13,-743.65, whereupon the Federal Reserve Bank delivered to him the above-mentioned notes and collateral. The unpaid balance on the principal of the Campbell note of $12,000 at this time was about $7,500. Under date of May 26, 1925, the Federal Reserve Bank by a quitclaim deed conveyed the Campbell land to Sellmeyer as receiver of the Carlsbad bank. On June 13, 1925, Sellmeyer, as receiver, in consideration of $500 paid to him, conveyed the Campbell land to L. W. White. On June 17th he, as receiver, executed a satisfaction and release of the Campbell mortgage upon the land. It is this deed and this release which both appellants ask to have set aside.

Under dates of January 14 and August 24, 1927, L. W. White conveyed to appellees W. W. White and H. R. White certain interests in the said lands. It appears that other parties have been given some interests in the lands by L. W. White. These were not made parties to this suit because they were admittedly purchasers without notice for value. Beyond question appellees W. W. White and H. R. White also acquired their interests in these lands for value and without notice of the claims now made by appellants.

As to the charges of fraud made by appellants against Sellmeyer and L. W. White:

About the 1st of January, 1925, L. W. White became chief representative of the Federal Reserve Bank in the southeastern territory of New Mexico in place of J. R. Nail who had resigned. Prior to that time White had been in the service of the Federal Reserve Bank under Nail. Shortly after becoming chief representative of the Federal Reserve Bank, White learned that his bank held the Campbell note of $12,000 and that it was paper of the Carlsbad bank then in the hands of Sellmeyer as receiver. He also learned of the Campbell deed to the Federal Reserve Bank.

Val J. Grund at this time was deputy governor of the Federal Reserve Bank and in charge of the business of his bank with insolvent banks in receivership. On direct examination he testified that he at one time had a conversation with L. W. White about the Campbell land; he believed Sellmeyer was present; to the best of his recollection the conversation took place in Carlsbad in January or March, 1925. On cross-examination, however, in answer to the question, "Was any one present besides you and Mr. White when you had this conversation?" his reply was, "I do not think so." The substance and effect of his testimony was that White said in that conversation that Sellmeyer was interested with him in this inquiry about the Campbell land. The witness expressed himself in various ways. He testified:

"I have in mind Mr. Sellmeyer was either mentioned in that conversation or somewhere else in this deal. * * * My own way to answer the thing is that Mr. Sellmeyer's name was mentioned in it in some way; whether it was in this conversation at this time or later on in some correspondence, I do not remember. * * * I do not want to say that he was interested in so far as the land was concerned; but he was interested in this proposition, whatever it was that he—to the best of my recollection I have always had that in my mind that Sellmeyer was tied in with this thing. * * * Whatever White had in mind, Sellmeyer was supposed to be in with him. In other words, that the proposition was put to me for him and Sellmeyer; that is the way I understood it. * * * Well, only that during the conversation—that is the first thing that entered my mind when this matter was brought to my attention, that White and Sellmeyer wanted to buy this land; that is the best I remember."

It also appears that the recorder's fee of $1.50 for recording the White deed was paid with the personal check of Sellmeyer. Over against this meager evidence of the fraudulent conspiracy charged in the complaint and cross-complaint there are the positive denials of both Sellmeyer and White, and in addi-

tion the utter lack of any evidence of any association or dealing between Sellmeyer and White since the transaction respecting the Campbell land was closed.

It is claimed by Gamble as receiver that the equity of the Carlsbad bank in the Campbell land was of much greater value than $500 at the time Sellmeyer deeded it to White, and that Sellmeyer as receiver betrayed his trust in accepting that amount of money for the bank's equity in the land. This contention is not based upon the value of the land for stock grazing, the purpose for which Campbell had used it. The witnesses for all the parties testifying upon this point agree in saying that the land for farming or stock-raising purposes in 1925 had no market value. It is in respect to its value as oil lands that the sale to White for $500 is attacked. The evidence shows that in 1925 there existed throughout the western territory of Texas and the eastern and southeastern portions of New Mexico more or less speculation in oil lands and possible oil lands. Many permits by the United States government were being granted for oil development on government lands. The state of New Mexico also was leasing many thousands of acres for the same purpose. Privately owned lands were also being more or less sought after by promoters of and speculators in oil development. Ten cents an acre paid annually for a period of five years was the usual rental of lands in the territory embracing the Campbell land. In some cases the rental price was as much as 25 cents per acre paid annually for five years. The record fails to show any offer to lease the Campbell land during or prior to 1925 at any price. The conditions respecting oil and gas leases in 1925 in Lea county where the Campbell land was situated are quite fully and fairly given by Powhatan Carter in his testimony. He said:

"I was engaged in obtaining oil and gas leases in Lea county in 1925. * * * I leased for oil and gas that year between 20,-000 acres and 25,000 acres, and paid 10 cents an acre for rental, except three tracts for which I paid 15 cents to 25 cents. * * * The land in this suit is about 21 miles south and 25 miles east of the Maljamar well. * * * Ten cents an acre was paid for the lease for oil and gas dated April 2, 1925, from J. W. Cooper. * * * It is from three to five miles from the land in question in this suit, or an average of four miles. I paid 10 cents an acre for oil and gas lease from Roy B. McQuatters to me, dated April 20, 1925. This lease covered 320 acres.

* * * It is from six to seven miles from the land involved in this suit. * * * I paid 10 cents an acre for oil and gas lease dated May 1, 1925, from H. L. Huston. * * * This lease covered 240 acres. * * * It is an average of a mile and a half to two miles from the land in question. * * * In the spring and first half of the year 1925 the N. ½ of Lea county was most desirable from the standpoint of oil and gas leases, on account of the large block of State leases on which they were drilling or preparing to drill, on the portion west of Tatum. * * * This is about 60 miles from the land in this suit. The land around that involved in this suit was not more valuable for oil and gas than any other part of Lea county. I had no difficulty in getting the leases at ten cents an acre. * * * In 1926 I was able to get renewals at 10 cents of leases which had lapsed for nonpayment of rentals. * * * A portion of them refused to accept 10 cents rental in the spring of 1926; probably one-half accepted the money. * * * I first became familiar with this land in the spring or late winter of 1925. In the late winter or early spring of 1925, I became acquainted with the fact that the receiver of the bank at Carlsbad desired to sell this property, and I investigated the title and went to acquire the description from a deed, as I recall now, the deed to the receiver made from the mortgage of Mr. Campbell to the Federal Land Bank. At that time Mr. White happened to be in Lovington, and in conversation I suggested that if he were willing I believed I would be willing to make him an offer for this land, take a half interest in it if he would be interested; and as I recall I looked at the description of it, probably wrote the Federal Land Bank to ascertain the status of the Federal Land Bank loan, and Mr. White, later, after considering it, reported that he wasn't interested, and then later he advised that he was interested and wanted to know if I would be. I told him I was not. As I recall, we decided that $500 and assuming the obligation of the Federal Land Bank loan would be all the property would be worth. I later discovered what the delinquent taxes would be. I don't know what was done, because I lost interest in the purchase.

"The way I happened to become interested in acquiring oil and gas leases in Lea County in the early part of 1925 was that I had some experience in 1920 in connection with oil leases and royalties, and it was the line of work that was interesting to me. I thought in the course of time there would be de-

velopment in southeast New Mexico and southwest Texas. Down in Reeves County, there was in 1920 a play, as we term it, though it stopped there and there was nothing done for quite a period of time afterwards. This was the reason I was interested. The trend of development was not towards Lea County from the Artesia field at that time. There was no production in New Mexico in 1920, as I recall. There was large acreage of state land under lease all over eastern New Mexico at that time. They were not trying to extend the Artesia field in the direction of Lea County in 1925. If so, it was not generally known. There was good production in Texas at that time, and later in the field in Reagan County and probably some activity in the way of drilling to the northwest of there, as I remember, in Crane County, to the southwest of Reagan County, there was some activity in drilling one or two wells in Loving County, Texas, bordering on the southwest of Lea County, down near the Pecos River. There may have been a well started in Winkler County, but nothing impresses it on my mind. The Amarillo Field was considerably to the northwest of Lea County. I don't know whether there was any activity in Loving County, Texas, at that time.

"It was my theory that Lea County was in between the Artesia Field and the Texas activity and probably the play would come from Texas over towards Lea County. I estimate I leased from twenty to twenty-five thousand acres. I was trafficking in the sale of these leases. The first I sold was near Lovington, at 25 cents an acre. I sold quite an acreage over the south half of Lea County at that price. The last sale I made was 20 cents an acre. I kept some of the leases until next year and got an average of 25 cents. This was net to me after paying commissions, except in one case, where I sold for 20 cents and paid commissions. On the average I sold individuals. I got as high as 50 cents an acre net in 1926. I was no longer interested in buying the land now in suit because I did not have the money and did not want to borrow it for speculation."

Such were the conditions existing at the time Sellmeyer as receiver released the mortgage and accepted $500 for the equity of the Carlsbad bank in the Campbell land.

In 1928 conditions had changed somewhat; hence this lawsuit. L. W. White testified that on January 6, 1928, he leased 320 acres of the land to F. S. Blackmar at $3 per acre, for which he or his grantees R. R.

and W. W. White received $960. On June 22, 1928, he leased 120 acres to the Gypsy Oil Company for which he or his grantees received $1,000. On August 24, 1928, he leased 120 acres to Val T. Billups for which he or his grantees received $9,000. On November 13, 1928, he executed a lease to the Gypsy Oil Company on 320 acres, for which he or his grantees received $24,000.

There is no evidence in the record that any drilling had been done upon the Campbell land prior to the trial in the court below.

Certainly no one would claim that because the speculative value of the mineral rights in the Campbell land from 1925 to 1928 increased from 10 cents an acre to $75 an acre constitutes in itself any ground for recovery in this action. The question of value relates to June, 1925, and under the conditions then existing. In April, 1925, Sellmeyer as receiver had paid the Land Bank of Wichita $235 to prevent a threatened foreclose of its mortgage upon the Campbell land. There were also unpaid taxes. No one had made any offer to lease the land at any price, either to Sellmeyer as receiver or to the Federal Reserve Bank while it had title to the land. As we shall see later, Campbell, the owner of the land, had not only deeded it to the Federal Reserve Bank, but had abandoned it. Was it the duty of Sellmeyer as receiver, under these conditions, to accept the best price he could get for the bank's equity in the land, or should he have paid the future installments falling due on the Land Bank indebtedness and the taxes past and future on the land, and held it for a possible increase in value as oil lands? It is very clear from the evidence that Sellmeyer never had any interest with White in the Campbell land, and it is equally clear that in the sale of the land to White he acted in good faith and, as he thought, for the best interest of his trust. That subsequent events proved he was mistaken does not render him liable in damages to either Gamble as receiver or to Campbell as equitable owner, assuming that he is such. The possibility of such an increase in values was much too remote and speculative to justify any court in holding that Sellmeyer was willfully guilty of a breach of trust or negligent in the discharge of his duty as receiver in not taking the course which appellants now so insistently assert he should have taken. The specifications of appellants that Sellmeyer made the sale of the land to White, without authority from the Comptroller and with authority

from the state court obtained by misrepresentation are also without merit.

■ On March 23, 1925, Sellmeyer wrote the Comptroller that he had a prospective purchaser at $500 for this land and advised that the Federal Reserve Bank be requested to accept the $500 and convey the land. The title at that time was still in the Federal Reserve Bank. On the day he wrote this letter to the Comptroller, V. J. Grund, deputy governor of the Federal Reserve Bank, wrote Sellmeyer from Dallas, Tex., this letter:

"Reference is made to your letter of March 13th, regarding the Martin L. Campbell note, secured by 1900 acres of land, held by us from the First National Bank, Carlsbad, New Mexico, against which the Federal Land Bank, Wichita, Kansas, holds a prior lien of approximately $3,500.00.

"I recall that this matter was discussed during my recent visit to Carlsbad, in which it is my understanding that Mr. L. W. White thinks the land referred to has some speculative value, but it is his opinion that there is no real equity in it above the prior lien that would warrant this bank protecting. The Federal Land Bank, Wichita, is preparing to institute foreclosure proceedings, but we have requested that they hold up the proceedings for a few days until we could write you. It is my understanding that Mr. White indicated his willingness to pay a small amount as a speculative proposition for the property, but as long as the note is held by us we could not enter into any negotiations with him, and we are wondering if anything has been worked out between you two in the matter.

"Unless something is done within the next few days, it will be necessary for us to advise the Federal Land Bank that there is not sufficient equity to warrant any advance on our part. We shall be pleased to hear from you at your earliest convenience."

On March 28th, Sellmeyer received this telegram from the deputy comptroller in answer to his letter of the 23d: "You authorized to advise with Federal Reserve Bank reference to sale of Campbell farm. If it deems advisable, you authorized to consent to sale for not less than five hundred dollars."

This telegram and the letter from Grund were received by Sellmeyer about the same time. With them in his hands it seems to us that he was justified in going forward with the deal and conveying to White without obtaining further authority from the Comptroller.

■ In his petition filed in the state court asking that court to authorize the sale of the land to L. W. White, Sellmeyer referred to the land "as among the assets coming into his hands as receiver," and recited that "with the consent and by authority of the Comptroller * * * he has contracted to sell said real estate to L. W. White * * * for the sum of $500.00." The designation of the land as assets of the bank and the recital that he had the consent and authority of the Comptroller to the sale are charged in the complaint and cross-complaint as fraudulent misrepresentations made by Sellmeyer in carrying out the alleged conspiracy with White. When this reference and recital are looked at as the words of an honest man, used in the faithful discharge of his official duties, the criticism of appellants is seen at once to be hypercritical. The land, while not an asset of the bank, was security for the payment of Campbell's notes to the bank, and its erroneous designation as an asset instead of as a security worked no injury to any one. In the proceedings in the state court for all practical purposes they would mean the same thing. As just said, he was justified in assuming that he had the authority of the Comptroller to make the sale. Our conclusion is that there were no defects of procedure, fraudulent or otherwise, which in any way vitiated the title White acquired through his deed from Sellmeyer as receiver, and that as against Gamble as receiver White's title is good and valid.

His title as against Campbell, however, depends upon still other considerations: (1) Did the power of sale given the Federal Reserve Bank pass with the land to Sellmeyer as receiver? (2) If it did not, is Campbell estopped by his laches to say it did not so pass?

■ The relation of Campbell to this land was essentially different from the relation of the receiver of the Carlsbad bank to it. At the time of the transfer of the land to White, Sellmeyer as receiver held the land as security only—as truly under the deed as under the mortgage—for the indebtedness of Campbell to the Carlsbad bank. Campbell's relation to the land was that of owner, subject to the deed as security and the lien of the mortgage for his indebtedness to the Carlsbad bank. With the deed and in the mortgage he gave a power of sale—in writing in the mortgage to the Carlsbad bank, and orally to the Federal Reserve Bank at the time the deed conveying the land to that bank was executed. The power of sale contained in the mortgage provides for notice by pub-

lication and sale at public auction; the oral power of sale accompanying the delivery of the deed to the Federal Reserve Bank contemplated a private sale without notice. It is settled that such a power of sale, whether given in writing or orally, is valid, and, when executed by the mortgagee, passes good title to the purchaser. Jackson v. Lawrence, 117 U. S. 679, 6 S. Ct. 915, 29 L. Ed. 1024; Bell Silver & Copper Mining Co. v. First National Bank of Butte, 156 U. S. 470, 15 S. Ct. 440, 39 L. Ed. 497; Scott v. Paisley, 271 U. S. 632, 46 S. Ct. 591, 70 L. Ed. 1123.

Under the decisions of the Supreme Court of New Mexico, a power of sale in a mortgage is held to be a power coupled with an interest which passes to the administrator of the estate of the deceased mortgagee. Cleveland v. Bateman, 21 N. M. 675, 158 P. 648, Ann. Cas. 1918E, 1011; Baca v. Chavez, 32 N. M. 210, 252 P. 987; Stewart v. Smalling, 33 N. M. 39, 261 P. 814, 56 A. L. R. 221.

In 41 C. J. p. 682, the following is stated to be the rule: "The power of sale in a mortgage will generally pass as a matter of course by the assignment of the mortgage, unless the power was so expressed as to be personal to the mortgagee."

It is quite clear from the evidence that there was no intention on the part of Campbell to make the power of sale given the Federal Reserve Bank personal to that institution.

Following the decisions of the Supreme Court of New Mexico, we hold that the power of sale given by Campbell to the Federal Reserve Bank was a power of sale coupled with an interest, and that it passed to Sellmeyer as receiver with the deed transferring the land to him.

If, however, it be conceded that this conclusion is erroneous, we are of opinion that Campbell is barred from recovery in this action by his laches. His attitude towards the land after the execution of the deed is clearly shown by a summary of his testimony and by his silence. He testified that on May 31, 1924, the date of the deed and bill of sale, he owed twenty-three or twenty-four thousand dollars; that he had no other assets than this land and the cattle mentioned in the bill of sale. He said: "I continued to live on my land until about December, 1924. I then went to Texas to work and I left because I couldn't make a living. * * * I thought I could lease the ranch out and keep off my creditors to whom I was indebted in the sum of $23,000 or $24,000 on this property. As to what I expected to get in rental on that place, well, sir, at that time pretty good pasturage for cattle would run 500 head. I had 2,000 acres of land, and ten sections under state lease and individual lease."

In sharp conflict with this hopeful statement made while on the witness stand in 1930 are the following letters written by him to the Federal Land Bank at Wichita, Kan. Under date of October 2, 1924, from Monument, N. M., he wrote: "I have turned my ranch over to the Federal Reserve Bank of Dallas, Texas. And the last half of 1923 taxes have not been paid."

Under date of February 20, 1925, from Lampkin, Tex., he wrote: "I have turned my land over to the Federal Reserve Bank of Dallas. As they had a second mortgage on it, and wanted a settlement and I couldn't pay so they took the land. If I could hold the land I would try to dig up the payment. But haven't got the money now."

He testified: "I left my ranch about December, 1924. From June, 1924, until December of that year I pastured cattle there on my ranch. When I left in December, I went to Lampkin, Texas, and stayed there a year or so. Then I went to Oklahoma, where I stayed over a year, then to Missouri, where I must have stayed ten or eleven months. I returned to Texas, where my mother was, and then came out here later. So far as I recall I didn't return the land after 1924 for taxation. After I left and went to Texas I was employed and earned some money, but I didn't remit any payment to the Federal Land Bank or pay any taxes. I didn't get enough ahead for that."

The nature and extent of oil developments in Eastern and Southeastern New Mexico were known to Campbell in May, 1924, when he executed the deed to the Federal Reserve Bank. He continued to reside upon the land until in December of that year, and must have known the situation respecting oil developments and speculation at the time he left the state. During the time he was out of the state he could have kept himself informed as to the conditions which in any way affected this land. He nowhere says in his testimony that he did not keep himself informed, and, in view of his silence, the presumption is that he did do so. He knew lands in Lea county were being leased by Carter and others during the year 1925 and after; he knew of the sale of the land by Sellmeyer and its purchase by White. He never at any time made any objection to the sale of the land by Sellmeyer to White prior

822

to the time he filed his cross-complaint in this suit. He never at any time after deeding the land to the bank made any effort to lease it for oil or for any other purpose. After May, 1924, he never paid or offered to pay either the taxes on the land or any past-due installment of his indebtedness to the Land Bank. His attitude towards the land in October, 1924, and in February, 1925, is indicated by his letters to the Land Bank. Clearly at that time he had lost interest in the land and intended that the Land Bank and others having liens thereon, could, so far as he was concerned, protect their interests in their own way. In 1929 and after the land began to have a speculative value for oil development he changed his mind and concluded to make White his trustee and reap the profit arising from White's speculation in 1925. At that time White paid $500 as the purchase price and $235 on account of installments over due to the Land Bank, as well as some additional sum on account of unpaid taxes. Since that time he and his grantees have paid the accruing installments of the Land Bank and all taxes assessed against the land. In this connection it should not be overlooked that the Land Bank would have foreclosed its mortgage in 1925 if White had not taken the land over. Had the Land Bank foreclosed its mortgage and sold the land in 1925 to White, or to any one, it is certain Campbell would not have redeemed it from such sale. It is also certain that if the conditions respecting this land had been in 1929 the same as existed in 1925, Campbell would not have changed his mind and this suit never would have been brought.

Apparently the court below was of opinion a court of equity should not lend Campbell aid in his attempt to realize upon his afterthought. We concur in that opinion.

The principles of equity applicable here are stated in the following cases: Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328; Taylor v. Salt Creek Oil Co. (C. C. A.) 285 F. 532.

The subject of laches has been discussed by this court in Columbian Nat. Life Ins. Co. v. Black, 35 F.(2d) 571, 71 A. L. R. 128; Clarke v. Boysen (C. C. A.) 39 F.(2d) 800.

By joining hands with Gamble as receiver in the prosecution of this action, Campbell invited the personal judgment entered against him for the balance unpaid on his notes.

The decree and judgment of the trial court is affirmed as to all parties; appellees to recover their costs.