The **AUTOMOBILE INSURANCE COMPANY OF HARTFORD, CONNECTICUT, et al., Appellants,**

v.

**UNITED ELECTRIC SERVICE COMPANY et al., Appellees.**

No. 15584.

Court of Civil Appeals of Texas. Fort Worth.

Feb. 11, 1955.

Rehearing Denied March 11, 1955.

Thompson & Coe, Will C. Thompson and Vernon Coe, Dallas, for appellants.

Rogers & Eggers and Guy Rogers, Wichita Falls, for appellee, United Electric Service Co.

Jones, Parish & Fillmore and Harold Jones, Wichita Falls, for cross-appellee, Williams-Dwyer Co.

RENFRO, Justice.

Suit was brought by Kindel Paulk, Roger Paulk and Sydney A. Gaines, comprising the firm of United Electric Service Company, a partnership, against The Automobile Insurance Company of Hartford, Connecticut, Phoenix Insurance Company, and Springfield Fire and Marine Insurance Company to reform certain policies and to recover $63,123.38 for loss sustained by fire on property belonging to plaintiffs and insured by defendants.

Plaintiffs also sued Williams-Dwyer Co., a partnership, the procuring agent of the policies. Williams-Dwyer was a general agent, with authority to issue policies and endorsements.

The pleadings of the plaintiffs are voluminous, occupying more than forty pages of the transcript. No attempt will be made to state or even summarize the pleadings. It is sufficient to say they were adequate.

Plaintiffs prayed that the policies be reformed to eliminate co-insurance clauses and they be allowed recovery for the full amount of the loss.

The Companies admitted liability to the extent of $53,229.04, the amount due if the co-insurance clauses were effective, and tendered that amount, with interest, into court. The plaintiffs, without prejudice to continue the suit for the difference in dispute, withdrew the deposit.

It was agreed the property had, as of the date of the fire, an actual cash value of $126,000 and the loss and damage was $63,123.38.

The three policies were in the aggregate amount of $85,000.

The plaintiffs tendered into court the difference between the premiums for full coverage and the amount for co-insurance.

The jury found that at the time of the renewals, June 27, 1951, no mention was made of co-insurance; plaintiffs did not authorize Dwyer to add such clauses and Dwyer never advised plaintiffs such clauses had been added; at no time prior to the fire did Gaines (managing partner) know of the co-insurance clauses and at no time did Dwyer tell Gaines of such clauses; at all times prior to the fire Gaines relied on Dwyer to write only such policies and en-

dorsements as Gaines ordered; Gaines and Dwyer never agreed upon the execution of any policy or endorsement that would contain an 80% co-insurance clause; in reliance on Dwyer to write only policies ordered by Gaines, he, Gaines, made no investigation of the contents of the policies; Gaines had never authorized the inclusion of an 80% co-insurance clause in any of the three policies in controversy; Grundy, plaintiffs' office manager, knew of the co-insurance clauses on or about June 27, 1951; Gaines, in the exercise of reasonable diligence, should have known on or about June 27, 1951, that the policies contained the co-insurance clauses; Dwyer delivered to plaintiffs notice of the addition of the co-insurance clauses; Dwyer was justified in inferring, following June 27, 1951, that plaintiffs accepted the policies with the 80% co-insurance clauses applicable.

All parties filed motions for judgment. The judgment entered read in part as follows:

"The Court finds from the pleading, the evidence and the Jury's verdict, and the applicable law, that on and prior to June the 27th, 1951, Plaintiffs had with the Corporate Defendants Fire insurance policies aggregating $52,500.00 on separate buildings without a coinsurance; that on or prior to June the 27th, 1951, the individual Defendants agreed with Plaintiffs to increase the coverage to $85,000.00 without any suggestion of coinsurance; that endorsements were issued on June the 27th, 1951, so increasing the amount of fire insurance but including a coinsurance provision; that in the fall of 1952 the individual Defendants agreed with Plaintiffs to make the policies apply to all of Plaintiffs' buildings under a new rate which the Insurance Commissioner set; that an endorsement and two renewal policies effective December the 15th, 1952, were issued to cover all of such buildings. That prior to the fire on February the 5th, 1953, coinsurance was never mentioned between Plaintiffs and Defendants; that Plaintiffs knew of no fact sufficient to put them on inquiry to read such policies and endorsements, and the Jury's answer to Special Issue No. 23 is disregarded. That notice to or knowledge by Mr. Grundy was not notice to or knowledge by Plaintiffs, and the Jury's answer to Special Issue Nos. 20, 20-A and 20-B are disregarded; that it is immaterial what Geo. M. Dwyer inferred, and the Jury's answer to Special Issue No. 35 is disregarded; that in this type of case neither negligence nor the failure to use reasonable diligence is a defense, and the Jury's answer to Special Issue No. 21 is disregarded; that Plaintiffs had the right to rely upon their insurance agent to continue the same form of insurance, and no duty arose from delivery of such policies to read them; and that the policies of insurance and endorsements in effect February the 5th, 1953, should be reformed to eliminate therefrom the co-insurance provision and as reformed enforced."

The court then reformed each policy and prorated the amount against each Company according to the amount of the particular policy. Plaintiffs were denied recovery against Williams-Dwyer.

Appellant Companies in their first five points of error claim the court erred in failing to hold plaintiffs bound by the policies as represented by the written instruments because by such instruments, they contend, plaintiffs had notice that the 80% co-insurance clauses were applicable, the agent Dwyer had authority from plaintiffs to make the co-insurance clauses applicable, plaintiffs have elected to accept benefits under certain endorsements, each of which contains the co-insurance provision, and that the record shows the plaintiffs were guilty of negligence in failing to discover the co-insurance clauses.

Appellants point out that in all a total of sixteen pieces of paper were delivered on six different days during the nineteen months between June 27, 1951, and February 5, 1953, showing 80% co-insurance was applicable.

Appellants contend ten single page endorsements, three simple credit memoranda and two renewal policies, delivered to plaintiffs' office on separate occasions, constitute

sufficient notice to estop plaintiffs from reformation, and further that since Grundy, office manager of plaintiffs, had notice of the addition of the co-insurance clauses, such notice was notice to the plaintiffs; that in order to recover plaintiffs must show the mistake was not notice through no negligence on their part, and that the receipt of the renewal policies charged plaintiffs as a matter of law with the contents thereof.

A study of the 400 page statement of facts discloses but little contradictory evidence.

Gaines is managing partner of United Electric Service Co. The two Paulks are "silent financial partners," taking no active part in the business. Gaines has carried insurance with Williams-Dwyer for thirty-three years. For several years preceding the present controversy Gaines dealt directly with Dwyer on matters pertaining to fire insurance for the partnership. Prior to June 27, 1951, none of the policies issued by Dwyer in behalf of the defendant Companies contained co-insurance clauses. Plaintiffs were protected in full to the face amount of the policies. Asked about his discussion with Dwyer prior to June 27, Gaines testified, "We just told him we wanted to increase it to $85,000." Co-insurance was not mentioned by either Gaines or Dwyer. Gaines testified that it was the understanding of both himself and Dwyer that the increased coverage would be to the full face amount of the policies. Gaines did not look at the endorsements, or any subsequent endorsements. He relied completely on Dwyer to issue the kind of insurance ordered. The endorsements of June 27th and all subsequent renewals and endorsements were mailed or delivered to plaintiffs' office and received by Grundy, plaintiffs' office manager. Grundy would make a note of the company issuing a policy or endorsement, the policy number, the face amount of coverage and date premiums due. Grundy never bought any insurance for plaintiffs and did not know what kind Gaines had ordered. Grundy did not know what co-insurance meant. He supervised the main office. He did no purchasing, but did pay the bills after they were approved by department heads.

Several days after the fire an adjuster told Gaines he had 80% co-insurance. Gaines immediately called Dwyer. Dwyer told Gaines he had looked up the original order and the co-insurance order was not in his, Dwyer's, handwriting.

On February 27, 1953, Williams-Dwyer Co. wrote this letter to the three Companies:

"Re: Automobile #41428 renewed under #41764
Phoenix #1342 renewed under 1475
Springfield #181

"Gentlemen:

"We have in force the three above captioned policies on the buildings owned and operated by the United Electric Service Company at the corner of Twelfth and Lamar Street. These premises, as you are aware, suffered a loss by fire on or about February 5, 1953.

"Under the Automobile Insurance Company policy number 41428, originally had in force $20,000.00 in coverage which was increased in the amount of $10,000.00 on June 27, 1951. When this policy came up for renewal, it was renewed for the $30,000.00 and on June 27, 1951, at the time we increased the policy, the 80% co-insurance clause was attached to the policy without the knowledge of the assured or any order given by him to attach the 80% co-insurance clause. The writer gave the order to increase the policy, but his order did not request the attachment of the co-insurance clause.

"Under the Phoenix Insurance Company policy number 1342, which was originally for $25,000.00 effective August 3, 1950. This policy was increased by endorsement effective June 27, 1951 in the amount of $15,000.00 and when the policy was increased, the 80% co-insurance clause was attached to the policy. This insurance was renewed August 3, 1951 under Phoenix Insurance Company policy number 4175 for $40,000.00 and the 80% co-insurance clause was attached to the policy. This same condition applies to this policy as applied to the Automobile policy, as the assured did not

give an order to attach the 80% co-insurance clause to this policy when the policy was increased nor did he authorize the attachment of the 80% co-insurance clause to the policy on its renewal date.

"Under Springfield Fire and Marine Insurance Company policy number 181, which became March 1, 1951 and expires March 1, 1954. This policy was originally issued in the amount of $7500.00 and on June 27, 1951 was increased in the amount of $7500.-00, making $15,000.00 coverage on the policy. Likewise, on this policy the 80% co-insurance clause was attached to the policy. Heretofore, the policy was not issued with any co-insurance clause at all and the co-insurance clause was attached without the order of the assured and without knowledge of the writer, who gave the order.

"All of this information has just came to light when the adjuster proceeded to discuss the loss with the assured and advised him of the attachment of the 80% co-insurance clause to the policies. He stated that he did not ever carry co-insurance on any of his policies and in case he did acquire policies that did have a co-insurance clause in the policy, he had had them immediately elliminated. Our agency cannot explain how the attachment of the 80% co-insurance clause occurred in respect to these building policies unless some clerk that heretofore was in our employ became confused and was told not to put a co-insurance clause on the policies and she thought possibly it was meant to attach co-insurance clause to the policies. Anyway, we are writing you these letters in order that this matter may be presented to your company with the request that these policies be allowed to be reformed at the date the error occurred, and the 80% co-insurance clause eliminated and the adjustor be permitted to go in and take care of the loss.

"We do not believe, however, that the 80% co-insurance clause will produce any major effect on the loss, but in the event that it does, we do not see any reason why this assured should suffer a penalty for something that he did not request and for something that he did not wish to be added or attached to his insurance policy. We ask that you kindly give us permission to instruct the adjustor to adjust the loss on the basis as though there was not any co-insurance clause involved.

"Sincerely yours,
"Williams-Dwyer Co.
(s) "Geo. N. Dwyer"

As a witness Dwyer testified that he knew the co-insurance clauses were in the endorsements when he delivered them to Grundy. He testified, however, that he did not order the clauses inserted, did not tell Grundy or Gaines about the endorsements, he did not know how the clauses got in the policies, and, further, that no part of the letter written to the Companies was untrue.

█ The rule is well settled that a policy of insurance may be reformed and made to speak the real agreement of the parties when such is caused either by fraud or mutual mistake in issuing the policy, Liberty Life Insurance Co. v. Woodward, Tex. Civ.App., 12 S.W.2d 243; and the fact that the insured accepted the policy without noticing the mistake would not preclude him from having the mistake corrected. Aetna Insurance Co. v. Brannon, 99 Tex. 391, 89 S.W. 1057, 2 L.R.A.,N.S., 548; 29 Am. Jur., p. 244; Cranfill-Reynolds Co. v. Security Insurance Co., Tex.Com.App., 67 S.W.2d 258.

██ Reformation of a fire policy may be effected even after loss has occurred if the agreement actually made by the parties has not been correctly incorporated in the instrument through mutual mistake or through fraud of one of the parties and mistake of the other, or where the policy does not represent the intention of the parties solely because of some fault or negligence of the agent of the insured, 24 Tex. Jur., p. 744, and this is true even when there have been several renewals of the contract over a period of years. Purcell v. Metropolitan Casualty Insurance Co., Tex.Civ. App., 260 S.W.2d 134. Mere acceptance and retention of a policy, especially a renewal policy, does not necessarily preclude the insured from obtaining a reformation

thereof in case of mutual mistake. In such case the insurer is not entitled to invoke the rule that the negligence of the insured in failing to read and understand the policy and in retaining it will preclude relief in equity. 44 C.J.S., Insurance, § 279, p. 1116; Commercial Standard Insurance Co. v. Paul, 35 Tenn.App. 394, 245 S.W.2d 775; Columbian National Life Insurance Co. v. Black, 10 Cir., 35 F.2d 571, 71 A.L.R. 128; 36 Tex.Jur., p. 762.

■ The law is well settled that an insurance company, through its duly authorized agent, may contract by parol for the renewal of a fire insurance policy, and in the absence of an agreement to the contrary the presumption is that the renewal is upon the same terms, conditions and amount as prescribed in the original policy. St. Paul Fire & Marine Ins. Co. v. Stell, Tex.Civ. App., 20 S.W.2d 399; Prudential Fire Ins. Co. v. Williams, Tex.Civ.App., 148 S.W.2d 264; Aetna Ins. Co. v. Short, 124 Ark. 505, 187 S.W. 657.

■ Knowledge by one party of the other's mistake regarding an expression of the contract is equivalent to mutual mistake. Pomeroy's Eq.Jur., 5th Ed., Vol. 3, p. 390; Restatement of the Law, Contracts, p. 973, sec. 505.

■ A court of equity will reform written instruments either where there is a mutual mistake or where there has been a mistake of one party accompanied by fraud or inequitable conduct of the other party. Welch v. Welch, 132 Ark. 227, 200 S.W. 139.

■ We have reached the conclusion that under the circumstances surrounding these transactions the endorsements and renewal policies in dispute were not written as agreed upon by Gaines and Dwyer. If Dwyer and Gaines both agreed $85,000 full coverage would be issued, Gaines is not precluded from recovering because he failed to see the co-insurance clauses which had been added. The only change Gaines asked Dwyer to make on June 27, 1951, was to increase the coverage to $85,000. Both knew at that time that the current

policies afforded Gaines full coverage to the full face amount of the policies. Dwyer knew that Gaines had never accepted policies with co-insurance clauses. Gaines had a right to presume that Dwyer would do exactly what Gaines asked him to do— merely increase the amount of the coverage. Later, when Gaines asked him to extend the coverage of each policy to all the buildings, that and that only was what he asked Dwyer to do. Gaines had a right to presume that Dwyer would do that. We believe the evidence as reflected by the record shows a mutual mistake. Dwyer's letter and his testimony show he did not order the clauses inserted. Gaines did not order the clauses inserted and did not want co-insurance. A mutual mistake occurred when the clauses were, unknown to and unauthorized by Dwyer, inserted in the endorsements. The fact that he delivered the endorsements, knowing that Gaines did not know the co-insurance clauses were in them and knowing Gaines did not want co-insurance clauses, should not, under the authorities heretofore noted, preclude Gaines from asking reformation of the contract to show the intention of the parties. The real intention of the parties at the time the policy was made will control. Delaware Ins. Co. v. Hill, Tex.Civ.App., 127 S.W. 283. Clearly the insertion of the co-insurance clauses was a mistake as far as Gaines was concerned. Under the circumstances, the fact that Dwyer allowed the endorsements to be delivered with the offending clauses therein, knowing of Gaines' ignorance of such addition and knowing Gaines wanted full protection to the extent of $85,000, was equivalent to mutual mistake.

Co-insurance was not in the policies prior to June 27, 1951. Dwyer, by his own testimony, did not insert or have inserted the co-insurance clauses in the later endorsements. The intention of the parties as adduced from all the circumstances and testimony was that the existing policies be continued in force as written, with the exceptions, first, that the amount of coverage was to be increased at one time, and, second, that endorsements later were to afford coverage over all the buildings as a unit.

■ The appellants contend that notice to Grundy was notice to appellees. Appellees have summarized Grundy's position in the following words: "His were but routine and ministerial duties in the conduct of an office with Four (4) girls under him to see that the books were properly kept, accounts posted, bills paid and the general routine of an office. He had no other or further duties and no other and further authority, and certainly the making of a new contract with new obligations on his principals and with less risk on the part of the insurers was wholly beyond the scope of his authority. Hence, his knowledge was not imputable to his principals * * *." We believe the statement to be a fair summary of the authority of Grundy and his duties as reflected by the evidence.

■ Generally, before notice or knowledge of an agent is imputed to his principal, the rule seems to be that it must first be shown that the authority of such agent extended to the very matter about which and concerning which such knowledge or notice was obtained. Oualline v. Champion Paper & Fibre Co., Tex.Civ.App., 206 S.W.2d 267; Missouri, Kansas & Texas Ry. Co. of Texas v. Belcher, 88 Tex. 549, 32 S.W. 518; J. M. Radford Grocery Co. v. Citizens' National Bank of Odessa, Tex.Civ. App., 37 S.W.2d 1080; Dimmitt Elevator Co. v. Carter, Tex.Civ.App., 70 S.W.2d 615; 2 Tex.Jur., p. 571.

We think, therefore, the court did not err in holding that notice to Grundy was not notice to Gaines. Furthermore, there is no evidence that he had any knowledge that the endorsements were different from what Gaines had ordered from Dwyer.

In answer to issue No. 23 the jury found that Dwyer delivered to plaintiffs notice of the addition of the co-insurance clauses. The only plaintiffs were Gaines and the two Paulks. There can be no contention, under the evidence, that either of the Paulks received any notice. The jury in answer to another issue found specifically that Gaines had no knowledge of the addition of the co-insurance clauses. The jury could have answered issue 23 as they did only in the belief that the delivery of the endorsements, etc., to plaintiffs' place of business constituted notice to the plaintiffs.

Since we have already held that mere delivery of the endorsements, etc., and the notice to Grundy were not notice to Gaines, it follows that we uphold the action of the trial court in disregarding the jury's answer to issue No. 23.

Appellants' first five points of error are overruled.

■ It is our belief that the proof warranted the decree of the trial court reforming and enforcing the policies. The policies as reformed express the original intent of the parties and are not new contracts as insisted by appellants. In reforming an instrument the court does not change the terms of the contract made by the parties, it merely declares what those terms were; that is, it makes the writing express the real intention or agreement of the parties.

Appellants' sixth point is based on the action of the court in refusing to permit Gaines to testify as to certain statements he allegedly made immediately following the fire.

■ The manner of the cross-examination and its extent must rest largely in the discretion of the trial court. Where the cross-examination is being unduly protracted, or is repetitious, the trial court may refuse further cross-examination. A careful examination of the entire record convinces us the appellants have failed to show any harm to them by the ruling of which complaint is made.

By point seven the appellants complain of the manner in which the charge was submitted to the jury.

It is our opinion that any errors in the court's charge, if there were any, did not amount to such denial of the rights of the appellants as was reasonably calculated to cause and did cause the rendition of an improper judgment.

All of appellants' points of error are overruled.

Appellees, in their pleadings, prayed in the event the policies were not reformed, then, in the alternative, they be allowed judgment against Williams-Dwyer Agency, and have presented four points of error as cross-appellants against said Agency, based on the action of the trial court in rendering judgment for Williams-Dwyer.

Believing a proper judgment was rendered by the trial court, we overrule appellees' points of error.

The judgment of the trial court is affirmed.